IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITY SERVICE COORDINATION, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD ARMSTRONG and LESLIE CLEMENT, in their official capacities;<br><br>Defendants. | Case No. CV-09-639-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Docket No. 4). For the following reasons, the Court denies the motion.

## BACKGROUND

Plaintiffs, six Idaho service coordination agencies, seek to enjoin Defendants Richard Armstrong, Director of Idaho Department of Health and Welfare ("IDHW"), and Leslie Clement, Administrator of IDHW's Medicaid Division, from continuing to implement a change in Medicaid reimbursement rates for service coordination benefits provided to developmentally disabled adults and children, which became effective on July 1, 2009. *Pls.' Mot. Prelim. Inj.* (Docket No. 4); *Pls.' Mem. in Supp. Mot. Prelim. Inj.* ("*Pls.' Mem. in Supp.*"), p. 2 n.1

**Memorandum Decision and Order - Page 1**

(Docket 4-1). Before July 1, 2009, IDHW reimbursed service coordination agencies that provided ongoing service coordination for developmentally disabled adults and children on a flat, monthly rate per Medicaid participant. *Simnitt Aff.*, ¶ 10 (Docket No. 14). Beginning on July 1, 2009, IDHW now requires service coordination agencies to bill such clients on a fifteen-minute incremental basis, and IDHW reimburses agencies accordingly. *Id.* ¶ 11.

The 2009 rate change "was the result of a multi-year analysis and collaborative process that began in July, 2005 when Idaho Code § 56-118 became law." *Pugatch Aff.*, ¶ 6 (Docket No. 15). Section 56-118 directs IDHW to "implement a methodology for reviewing and determining reimbursement rates" to service coordination agencies. Idaho Code Ann. § 56-118(1). In May 2005, Sheila Pugatch, the Principal Financial Specialist in IDHW's Office of Reimbursement Policy, was placed in charge of developing the methodology required by section 56-118. *Pugatch Aff.*, ¶ 7.

IDHW took many steps over the course of a four-year period in order to develop a methodology for reviewing and determining reimbursement rates. For example, IDHW conducted cost studies each year from 2005 to 2009. *See id.* ¶¶ 8, 16, 20, 21. In 2006 and 2007, IDHW contracted with the consulting firm Johnston-Villegas-Grubbs and Associates, LLC (JVGA) to help develop surveys,

compile date, analyze data, and develop a reimbursement methodology. *Id.* ¶¶ 9, 14. IDHW hired another consulting firm in 2006 to compare Idaho reimbursement rates with those of other states. *Id.* ¶ 12. IDHW prepared draft calculations in April 2008 and presented those calculations to service coordination agencies. *Id.* ¶ 20. After receiving feedback from agencies, IDHW added other cost categories into the calculation. *Id.* IDHW used the "data accumulated from the cost and other studies performed in 2005, 2006, 2007, 2008, and 2009" to establish the reimbursement method at issue.[1] *Id.* ¶ 23. IDHW then submitted State Plans Amendments regarding the new reimbursement methodology to the Centers for Medicare & Medicaid Services ("CMS")[2], which determined that the plans complied with federal regulations. *Id.* ¶ 24; *see Simnitt Aff.*, Exh. D-20 (Docket No. 14-1) (CMS letters of approval), Exh. D-21 (Docket No. 14-1) (CMS letter to a service coordination agency stating that IDHW's "actions comply with federal regulatory requirements").

---

[1] A complete summary of the steps that IDHW took in developing its new reimbursement methodology is described in Sheila Pugatch's affidavit. *See Pugatch Aff.*

[2] CMS is "the federal agency that administers both the federal Medicare and Medicaid programs and enforces the rules and regulations that [IDHW] must comply with to receive federal funding for these programs." *Pugatch Aff.*, ¶ 16.

**Memorandum Decision and Order - Page 3**

IDHW also went through the rulemaking process while developing its new reimbursement methodology. In March 2008, IDHW "published a 'Notice of Intent to Promulgate Rules – Negotiated Rulemaking' with respect to 'Medicaid Enhanced Plan Benefits,' a part of which was the proposed amendment to change reimbursement for providers from a flat monthly rate to 15-minute increments." *Simnitt Aff.*, ¶ 5; *see id.* Exh. D-16. In October 2008, IDHW published a "Notice of Rulemaking – Proposed Rule" and a public hearing schedule. *Id.* ¶ 6; *see id.* Exh. D-17. The Idaho Senate approved the rules in January 2009, and the reimbursement rate change took effect on July 1, 2009. *Id.* ¶ 7.

Under the new billing and reimbursement method, it is unclear whether service coordination agencies must provide eight minutes of continuous service to a client before being able to bill a fifteen-minute unit for that service. On June 3, 2009, IDHW issued "Information Release 2009-11," which informed service coordination agencies of the new reimbursement rules. *Bills Decl.*, Exh. 1 (Docket No. 4-3). According to Information Release 2009-11, "a single 15-minute unit of service delivery can be billed if it is equal to or greater than eight minutes." *Id.* The Information Release referred service coordination agencies to the *Idaho Medicaid Provider Handbook* for further explanation about billing in fifteen-minute increments. *Id.* In turn, the *Idaho Medicaid Provider Handbook* appears to

**Memorandum Decision and Order - Page 4**

allow service coordination agencies to aggregate minutes spent over the course of a day providing services to a particular client. *Id.* at Exh. 3, pp. 3-3 to 3-4 ("It does not imply that any minute until the eighth minute should be excluded from the total count as the timing of active treatment includes all time."). Additionally, the Idaho State Plan Amendments that IDHW submitted to CMS state that "[m]inutes of service provided to a specific individual can be accrued over one calendar day." *Id.* at Exh. 4, p. 32. In contrast, an e-mail sent by David Simnitt, an IDHW Program Manager, appears to prohibit the aggregation of minutes in order to reach the eight-minute threshold for billing purposes.[3] Service coordination agencies have been instructed that, under the new reimbursement method, aggregation is not permitted. *Bills Decl.*, ¶ 4; *Hansen Decl.*, ¶ 6 (Docket No. 4-5); *Kotts Decl.*, ¶ 6 (Docket No. 4-6); *Meads Decl.*, ¶ 10 (Docket No. 4-7); *Butler Decl.*, ¶ 7 (Docket

---

[3] Simnitt's e-mail responds to an inquiry from another Program Manager, Annette Wilkinson, regarding conflicting messages about the eight-minute rule and asking for clarification to "ensure a consistent message in Region 5." *Bills Decl.*, Exh. 5. Simnitt's e-mail reads, in pertinent part:

> Service coordinators and paraprofessionals should use the "8-minute rule" when calculating 15-minute unit billing. Sometimes they will be reimbursed for slightly more time than they actually worked and other times slightly less. This should average out over time. *Adding together contact times of less than 8 minutes would cause this averaging effect not to work*.

*Id.* (emphasis added).

**Memorandum Decision and Order - Page 5**

No. 29-1).

Plaintiffs assert that "the effect [of the new reimbursement] rate combined with the '8-minute' rule has been a major reduction in reimbursement to Service Coordination Agencies for performing the same services they performed prior to July 1, 2009." *Pls.' Mem. in Supp.*, p. 8. Plaintiffs and owners of other service coordination agencies claim that the new reimbursement method has reduced their revenues anywhere from twenty to sixty-five percent; increased non-billable time; caused some agencies to discontinue service to clients in rural areas and cut employee benefits; and, in one case, caused an agency to cease doing business as of January 2010. *See Beck Decl.*, ¶¶ 4, 6, 7 (Docket No. 4-2); *Bills Decl.*, ¶¶ 5, 6, 7, 9, 10; *Brinegar Decl.*, ¶¶ 6–8 (Docket No. 4-4); *Hansen Decl.*, ¶¶ 5–9; *Kotts Decl.*, ¶¶ 6–8; *Meads Decl.*, ¶¶ 6, 7, 10; *Straughan Decl.*, ¶ 5 (Docket No. 4-8); *Butler Decl.*, ¶¶ 3–7; *Short Decl.*, ¶¶ 4–5 (Docket No. 29-2) (stating that Lloyd Brinegar & Short Associates, LLC went out of business in January 2010 because it could "no[t] afford to stay in business under the new rate structure").

## ANALYSIS

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and

[4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, — U.S. —, —, 129 S. Ct. 365, 374 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 376 (citation omitted). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (internal quotation marks and citation omitted). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 376–77 (internal quotation marks and citation omitted).

Here, Plaintiffs have failed to show that they are likely to succeed on the merits of their claim, that the balance of equities tips in their favor, and that an injunction is in the public interest.

## A. Likelihood of Success on the Merits

Plaintiffs claim that IDHW's new reimbursement method violates § 30(A) of the Medicaid Act, 42 U.S.C. § 1396a et seq. *Compl.*, ¶¶ 26–30 (Docket No. 1). Section 30(A) requires that a State plan

> provide such methods and procedures relating to . . . the payment for[] care and services . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general

**Memorandum Decision and Order - Page 7**

population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A). Plaintiffs claim that the new reimbursement method is not consistent with economy, efficiency, maintaining quality of care, or maintaining access to care, *Compl.*, ¶¶ 28–30, and thus is pre-empted by the Medicaid Act, *id.* ¶ 33.

Plaintiffs argue that they are likely to succeed on the merits for several reasons. First, Plaintiffs argue that the July 2009 rate change is pre-empted by the Medicaid Act because IDHW "did not undertake any significant consideration of the 30A factors when it determined to change rates"; particularly, IDHW "did not perform any studies relating to whether a 20–65% reduction in reimbursement was consistent with quality of care or would be sufficient to assure access to care." *Pls.' Mem. in Supp.*, pp. 14–16.

The evidence does not support Plaintiffs' assertions. Between 2005 and 2009, IDHW conducted several cost studies and hired two consulting firms in order to develop a reimbursement methodology that would comply with federal and state statutory requirements. For example, JVGA undertook extensive costs studies that utilized data provided, in part, by Idaho service coordination agencies, certified family homes, and the Bureau of Labor Statistics. *Pugatch Aff.*, Exh. D-4 (Docket No. 20) (JVGA Final Report: 2008 Update). Additionally, the 2009

**Memorandum Decision and Order - Page 8**

survey conducted by IDHW requested that Idaho service coordination agencies provide specific data that would help IDHW assess what percentage of costs were being spent on providing direct care to clients versus the percentage spent on other costs, such as administrative staff, program supervision, supplies, materials, transportation, equipment, and building related expenses. *Pugatch Aff.*, Exh. D-12 (Docket No. 24) (IDHW's 2009 Survey Instructions). These studies and surveys demonstrate that IDHW considered economy and efficiency when developing its new reimbursement methodology.

Moreover, during the process of developing the new reimbursement methodology, IDHW contemplated that the quality of care should increase because the new reimbursement methodology provides service coordination agencies with an "incentive to provide at least two hours and twenty-three minutes of service coordination per month to maintain the same level of payment for a participant in a month." *Simnitt Aff.*, ¶ 12. In contrast, under the pre-July 2009 reimbursement method, agencies "were reimbursed a flat monthly rate for each participant regardless of how much or how little service coordination was provided." *Id.* Additionally, the new reimbursement method actually increased the amount that service coordination agencies can be paid on a monthly basis per participant.[4] *Id.*

---

[4] Under the previous reimbursement method, service coordination agencies could only be
(continued...)

**Memorandum Decision and Order - Page 9**

¶¶ 9, 14. These financial incentives demonstrate that IDHW considered how the new reimbursement methodology would be consistent with maintaining quality of care.

Finally, when developing the new reimbursement methodology, IDHW determined that the rate change would be budget neutral and, thus, IDHW expected access to care to remain the same. *Defs.' Mem. in Opp'n*, p. 16 (Docket No. 13); *see also Pugatch Aff.*, ¶ 25 (stating that the data collected since the rate change "demonstrates that the revised State Plan is overall budget neutral). Because IDHW did not expect the rate change to cause a twenty to sixty-five percent reduction in reimbursement rates, it is logical that IDHW did not conduct studies regarding whether such a reduction would be consistent with quality of care and access to care. However, the lack of such a study does not demonstrate that IDHW failed to consider how the rate change would impact access to care.

In sum, the evidence demonstrates that IDHW did consider the § 30A factors when developing the new reimbursement methodology. Thus, the Court finds that Plaintiffs are not likely to succeed on the merits based on their first argument.

Second, Plaintiffs argue that the new reimbursement method is not, as

---

[4](...continued)
reimbursed the flat rate of $108.33 per month, per participant. *Simnitt Aff.*, ¶ 14. Under the new reimbursement method, service coordination agencies can be reimbursed up to $198.72 per month, per participant. *Id.*

**Memorandum Decision and Order - Page 10**

applied, consistent with economy, efficiency, quality of care, and access to care. *Pls.' Mem. in Supp.*, pp. 16–17. Again, the evidence does not support Plaintiffs' assertions. Plaintiffs provide evidence that the new reimbursement method has caused them significant hardship, demonstrated by their loss of revenues, increased non-billable time, discontinuance of services to clients in rural areas, reduction in employee benefits, and, in one case, cessation of business. However, Plaintiffs represent only about seven percent of the total number of service coordination agencies in Idaho, *Simnitt Aff.*, ¶ 23, and Plaintiffs have not provided evidence that the effects that they are experiencing are typical of most service coordinators in Idaho.

In contrast, IDHW provided evidence demonstrating that Plaintiffs' experiences are not demonstrative of the majority of Idaho service coordination agencies. For example, according to IDHW records, since July 1, 2009, although four service coordination agencies closed, twenty-eight new service coordination agencies entered the market. *Id.* ¶¶ 17, 19. Moreover, it appears that clients of the agencies that closed have successfully transitioned to new service coordination agencies, *id.* ¶ 17, and IDHW's complaint and critical incident database reveals "no reports that participants are unable to find a service coordinator," *id.* ¶ 20.

Plaintiffs are only able to point to two former clients of Lloyd Bringar &

**Memorandum Decision and Order - Page 11**

Short Associates, LLC who have not been able to find a replacement service coordinator, *Short Decl.*, ¶ 5. This evidence is not sufficient to support Plaintiffs' argument that the new reimbursement methodology, as applied, is inconsistent with access to care, especially in light of additional evidence provided by IDHW demonstrating that the new reimbursement methodology, as applied, is consistent with access to care. *See Cardwell Aff.*, ¶ 2 (Docket No. 13-1) (stating that IDHW's office of Family and Community Services has not received any complaints indicating that families or participants are having difficulty finding service coordinators); *Wilkinson Aff.*, ¶¶ 2–3 (Docket No. 13-2) (stating that participants in Regions V, VI, and VII have continued access to care, despite the closure of two service agencies in those areas since July 1, 2009); *Christensen Aff.*, ¶ 2 (Docket No. 13-3) (stating that Regions III and IV "have not seen a reduction in access to service coordination, . . . the quality of services has not decreased, and . . . service coordination agencies continue to hire new employees to maintain and increase their business"); *Gerlitz Aff.*, ¶ 2 (Docket No. 13-4) (stating that "there are no service coordination access issues in either Regions 1 or 2").

Finally, in regards to quality of care, the only specific evidence Plaintiffs provide is a statement from a service coordinator stating that "the doubling of [his] caseload has negatively affected the quality of service [he] can offer," *Short Decl.*,

**Memorandum Decision and Order - Page 12**

¶ 7, and a statement from another service coordination agency stating that high employee turnover "has certainly affected the quality services which our clients deserve," *Hansen Decl.*, ¶ 8. IDHW provided evidence that the Bureau of Developmental Disabilities substantiated two service coordination related complaints in 2009; however, both of those complaints resulted in provider corrective action. *Gerlitz Aff.*, ¶ 3. This evidence is insufficient to support Plaintiffs' argument that the new reimbursement methodology, as applied, is inconsistent with quality of care.

In sum, Plaintiffs have not provided sufficient evidence supporting their argument that the new reimbursement method is not, as applied, consistent with economy, efficiency, quality of care, and access to care. Thus, the Court finds that Plaintiffs are not likely to succeed on the merits based on their second argument.

Finally, Plaintiffs argue that the new reimbursement method does not bear a reasonable relationship to the cost studies undertaken by IDHW. *Pls.' Reply Mem. in Supp. Mot. Prelim. Inj.* ("*Pls.' Reply*"), pp. 4–17 (Docket No. 29). Plaintiffs attack certain figures and calculations used by IDHW in developing its new reimbursement methodology. *See id.* However, Plaintiffs' technical arguments are not based on expert testimony, and the Court is unable, based on its review of the evidence, to conclude that there was any problem with the methodology IDHW

used in developing its new reimbursement rate. Accordingly, Plaintiffs have not met their burden of demonstrating that the methodology IDHW used was not reasonably related to IDHW's cost studies, and the Court finds that Plaintiffs are not likely to succeed on the merits based on their third argument.

**B. Balance of Equities; The Public Interest**

Plaintiffs argue that the balance of equities tips in their favor because they have suffered and will continue to suffer irreparable monetary harm if an injunction is not granted. *Pls.' Mem. in Supp.*, pp. 17–18; *Pls.' Reply*, pp. 17–20. Additionally, Plaintiffs argue that an injunction is in the public interest because, absent an injunction, Medicaid beneficiaries will suffer reduced access to service coordination benefits and reduced quality of care. *Pls.'s Mem. in Supp.*, pp. 18–19; *Pls.' Reply*, pp. 20–21.

Although the Court recognizes, as addressed in the following section, that Plaintiffs have demonstrated a risk of irreparable monetary harm if an injunction is not issued, the Court finds that the balance of equities tips in favor of Defendants. Defendants assert that if an injunction is granted and the Court orders IDHW to return to using its previous reimbursement method, then IDHW would be out of compliance with its approved State Plan and in violation of federal law. *Defs.' Mem. in Opp'n*, p. 21 (citing to 42 U.S.C. § 1396a(a)(1), which states: "A State

**Memorandum Decision and Order - Page 14**

plan for medical assistance must provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them"). In turn, Defendants assert that such non-compliance would put Idaho's Federal Matching Assistance Program at risk, which provides approximately eighty percent of the funding for service coordination benefits. *Id.* Plaintiffs do not dispute this argument. *See Pls.' Reply*. The Court finds that IDHW's concern with complying with federal law overrides Plaintiffs' financial concerns, especially in light of the Court's finding that Plaintiffs are not likely to succeed on the merits of their claim.

Additionally, an injunction would not be in the public interest if it caused IDHW to lose eighty percent of the funds used to provide service coordination benefits. The loss of such funds would significantly jeopardize the public interest in access to quality service coordination benefits. Moreover, as explained in the preceding section, the evidence does not support Plaintiffs' argument that the new reimbursement method is causing reduced access to care and reduced quality of care. Thus, the Court finds that an injunction is not in the public interest.

## C. Likelihood of Irreparable Harm

Plaintiffs argue that they have suffered and will continue to suffer irreparable monetary harm if an injunction is not granted. *Pls.' Mem. in Supp.*, pp. 17–18; *Pls.' Reply*, pp. 17–20. "Typically, monetary harm does not constitute

**Memorandum Decision and Order - Page 15**

irreparable harm." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009) ("*Cal. Pharmacists Ass'n I*") (citation omitted). However, in cases where Eleventh Amendment sovereign immunity of a state department would bar plaintiffs from recovering damages in federal court, plaintiffs can show a risk of irreparable harm by demonstrating that, as Medicaid providers, "they will lose considerable revenue through the reduction in payments that they will be unable to recover." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, — F.3d —, No. 09-55532, 2010 WL 715401, at *12 (9th Cir. Mar. 3, 2010); *see also Cal. Pharmacists Ass'n I*, 563 F.3d at 851–52.

Here, Plaintiffs have demonstrated that the implementation of the new reimbursement method has resulted in a reduction of revenues.[5] *See Beck Decl.*, ¶ 4 (stating that, since the new reimbursement method took effect, revenues have been reduced by approximately sixty-five percent); *Bills Decl.*, ¶ 7 (stating that, since the new reimbursement method took effect, monthly revenues have fallen between twenty and twenty-five percent); *Brinegar Decl.*, ¶ 7 (stating that, since

---

[5] In light of evidence that twenty-eight new service coordination agencies have entered the market since July 1, 2009, while only four have closed, *see Simnitt Aff.*, ¶¶ 17, 19, the Court questions whether the new reimbursement method is the actual cause of Plaintiffs' reduced revenues. If the new reimbursement method causes the significant revenue reduction claimed by Plaintiffs, the Court would expect to see an overall decline in the number of service coordination agencies, instead of an increase.

**Memorandum Decision and Order - Page 16**

the new reimbursement method took effect, monthly revenues have fallen by twenty-one percent); *Kotts Decl.*, ¶ 7 (stating that, in October 2009, Unity Service Coordination experienced a twenty-five percent reduction in reimbursement rates); *Meads Decl.*, ¶ 7 (stating that, since the new reimbursement method took effect, income has fallen by sixty to sixty-five percent); *Butler Decl.*, ¶ 7 (stating that, since the new reimbursement method took effect, revenues have declined by approximately fifty percent); *cf. Straughan Decl.*, ¶ 7 (stating that revenues have remained the same, although "our staff has had to work countless extra unpaid hours to provide the same high quality services"). Additionally, the Eleventh Amendment would bar Plaintiffs from recovering lost revenue from IDHW in federal court. Accordingly, the Court finds that Plaintiffs have demonstrated a risk of irreparable monetary harm in the absence of a preliminary injunction. However, because Plaintiffs have failed to show that they are likely to succeed on the merits of their claim, that the balance of equities tips in their favor, and that an injunction is in the public interest, the Court denies Plaintiffs' Motion for Preliminary Injunction.

# **ORDER**

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (Docket No. 4) shall be, and the same is hereby DENIED.

DATED: **March 20, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge