James M. Piotrowski
Marty Durand
HERZFELD & PIOTROWSKI, LLP
P.O. Box 2864
824 West Franklin
Boise, Idaho  83701
Telephone: (208) 331-9200
Facsimile: (208) 331-9201

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITY SERVICE COORDINATION, INC., et al,<br><br>          Plaintiffs,<br><br>                    v.<br><br>RICHARD ARMSTRONG, and LESLIE CLEMENT,<br><br>          Defendants. | Case No. 1:09-CV-639-BLW<br><br>PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |

Plaintiffs are a group of Service Coordination Agencies and Medicaid Providers who provide services that allow developmentally disabled adults and children, adults with severe and persistent mental illness and physically disabled adults to obtain and access social, medical and rehabilitative services available through Medicaid and other benefit program across the State of Idaho.  Service Coordinators such as the Plaintiffs ensure that those who are not able to access medical and social services funded with federal dollars on their own receive the assistance necessary obtain those services.

Plaintiffs brought suit and moved for a preliminary injunction on several bases including that the State of Idaho's reimbursement rate would impair access to care and quality of care, in violation of the provisions of 42 USC §1396a(a)(30) relating to access and quality, and that the

1.  Memorandum in Support of Motion for Summary Judgment

State of Idaho had nor performed responsible cost studies or developed a reimbursement rate reasonably related to the actual costs of providing services as required by Nintch Circuit case law interpreting §1396a(a)(30)'s provisions regarding economy and efficiency. Although factual disputes remain about the actual effects of the reimbursement rate change on quality of and access to care, there is no basis to raise any genuine dispute of material fact that the cost studies performed by the Department were inadequate, that the rate actually applied bears no relation to the actual cost of providing services and that, as a result the State is in violation of §1396a(a)(30)'s provisions concerning economy and efficiency. Because the undisputed facts demonstrate that the current reimbursement rate utilized for certain Service Coordination services is not based upon responsible cost studies or reasonably related to the actual cost of providing services, Plaintiffs are entitled to summary judgment on the liability aspects of their claim that utilization of that rate violates federal law.

**I. Undisputed Facts**

The facts of this case relevant to final judgment are not in dispute. Both parties submitted extensive briefing and discussion of the facts in support of and in opposition to Plaintiffs' motion for preliminary injunction. For purposes of this motion for summary judgment, Plaintiffs rely upon the facts as asserted by Defendants in opposition to that motion, the affidavits and declarations of Defendants' witnesses and the Defendants' responses to Plaintiffs' requests for admission.

1. Medicaid is a cooperative federal-state program through which the federal government reimburses states for certain medical expenses incurred on behalf of needy persons. *Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513 (1990). Participation by states is voluntary, and those that choose to participate must comply both with statutory requirements

2.  Memorandum in Support of Motion for Summary Judgment

imposed by the Medicaid Act and with regulations promulgated by the Secretary of Health and Human Services. *Id.* (Defendants' Memorandum in Opposition to Motion for Preliminary Injunction, p. 2).

2. Service Coordination in Idaho is a benefit available for Medicaid eligible individuals who are covered under the Enhanced Benchmark Plan. The plan covers eligible individuals who have disabilities or special health needs. Service Coordination is a brokerage model, meaning referral or arrangement for services identified in assessment; not the provision of direct services. IDAPA 16.03.10.721.02. (Defendants' Opposition, p. 3).

3. During the 2005 Idaho legislative session, House Bill 190 was passed and codified at Section 56-118, Idaho Code, directing the Idaho Department of Health and Welfare (IDHW) to implement a methodology for reviewing and determining Medicaid reimbursement rates to private businesses providing a variety of services, including Service Coordination. In response to this directive, IDHW developed and conducted a survey of service coordination agencies during the summer of 2005. Pugatch Aff., ¶¶ 7-8, Ex. D2. Only five percent (5%) of the total number of agencies responded to the survey. None of the Plaintiffs responded. Pugatch Aff.¶ 8. This unsatisfactory response by Service Coordination providers prompted IDHW to engage a professional consulting company with experience conducting studies and developing reimbursement methodologies for Medicaid covered services. Pugatch Aff., ¶ 9. (Defendants' Opposition, p. 4).

3. In 2006, IDHW contracted with Johnston, Villegas-Grubbs and Associates, LLC (JVGA) to conduct cost studies and assist with the development of a reimbursement methodology. JVGA recommended that IDHW develop a methodology based upon the "Arizona Model," a model originally developed for the State of Arizona that has become a best practice through its implementation in other states. Pugatch Aff., ¶ 9. This model is designed to establish a fair and

3.  Memorandum in Support of Motion for Summary Judgment

equitable process for establishing rates based on actual market costs expressed as a relationship to direct service staff wages (referred to as a Staff Support Hour (SSH) rate approach). Pugatch Aff., para. 11. (Defendants' Opposition, p. 4-5).

4. The four standard cost components assumed to be common to all service providers included in the SSH study were: (1) direct services staff wage; (2) employment-related expenditures; (3) program-related expenditures; and (4) general and administrative expenditures. Pugatch Aff., ¶ 11, Ex. D-3, p. 13. (Defendants' Opposition, p. 5).

5. IDHW asked Service Coordination providers to resubmit their cost data and providers requested that IDHW consider non-billable time by direct services staff as program-related expenditures. IDHW allowed providers to submit their data in this fashion but advised them that categorization of these costs as program-related expenditures would ultimately have to be approved by CMS. Pugatch Aff., ¶ 16. Also in 2008, IDHW decided to use the Bureau of Labor Statistics (BLS) wage comparison rates for Idaho only in order to accurately reflect the wages paid in Idaho. Pugatch Aff., ¶ 18. In 2008, IDHW received cost data from only three service coordination agencies. Pugatch Aff., ¶ 19. (Defendants' Opposition, p.5- 6).

6. IDHW staff developed a customized rate calculation for service coordination based on the data received since 2005 and the framework of the "Arizona Model." Service coordination agencies were invited to review and comment on the draft rate calculation. Based on the comments of the agencies that participated, IDHW added cost categories, such as, travel time, time transporting clients, and training to the calculation for non-productive direct care staff time, and mileage costs. Pugatch Aff., ¶ 20. (Defendants' Opposition, p. 6).

7. In 2009, IDHW again sought to update its data by requesting cost data from service coordination providers through State Fiscal Year 2008 (July 1, 2007 – June 30, 2008). Pugatch Aff., ¶ 22. It also conducted a time-study survey of service coordinators for one month to

4.  Memorandum in Support of Motion for Summary Judgment

capture direct services and indirect services time. Pugatch Aff., ¶ 21. This survey differentiated the professional service coordinators from the para-professional service coordinators. *Id*. The 2009 time-study survey garnered greater participation from Service Coordination agencies – a total of 20 fully participated. *Id*. Four of the plaintiff agencies participated. *Id*. The data from this 2009 survey was added to that of the surveys from 2005 through 2009 and was used to set the 15 minute incremental rate at issue. Pugatch Aff., ¶ 23. (Defendants' Opposition, p. 6).

       8.  Following adoption of changes to Service Coordination administrative rules, on June 3, 2009, IDHW distributed to all Medicaid enrolled Service Coordination providers an Information Release providing explanation of the rule changes and attaching a detailed rate chart for service coordination which took effect on July 1, 2009. Simnitt Aff., ¶ 8, Ex. . The rates reflect the development of a methodology specifically for Idaho service coordination based on provider survey data from 2005 through 2009. Pugatch Aff., ¶¶ 6-24 and Exhibits cited to therein. (Defendants' Opposition, p. 7).

       9.  The new reimbursement method is based on an hourly billing approach, as opposed to the flat rate approach utilized prior to July 1, 2009.  Pugatch, para. 5.

       10.  The work of Johnson, Villega-Grugg and Associates resulted in a detailed study report that was provided to the 2007 Idaho Legislature, including recommended reimbursement rates for Service Coordination.  (Pugatch, Ex. D-3).

       11.  Johnson, Villegas-Grubb updated their report in 2007 and provided additional data on providers costs to the 2008 Idaho Legislature. (Pugatch, Ex. D-4).

       12.   IDHW continued to perform studies of the costs of services, resulting in additional data on provider costs.  (Pugatch, Ex. D-13).

       13.  The final rate calculation was based on specified factors including a base wage rate collected from Bureau of Labor Statistics studies, employment related expenditures,

5.  Memorandum in Support of Motion for Summary Judgment

non-productive staff time, mileage costs, paid leave time and indirect cost.  (Pugatch, Ex. D-14).

14.  In the course of its cost studies, IDHW determined that the cost of program supervision came to 24.28% of direct care staff wages; that administrative staff costs came to 21.93% of direct care staff wages; that supplies, materials, transportation and equipment expenses came to 19.78% of direct care staff wages; and, that building expenses came to 13.45% of direct care staff wages.  (Ssecond Supplemental Declaration of Piotrowski, Ex. 1, Defendants' Response to Requests for Admission No. 6, 7, 8, 9).

15.  In calculating the final, 2009 reimbursement rate that was implemented on July 1, 2009, IDHW included all program-related expenditures, salaries of program administrators, employment related expenses of administrators, lease or rental costs, depreciation and amortization, interest on capital debt, real estate taxes, property insurance, and supplies, materials and equipment costs in the "Indirect Cost" category of the TCM rate calculation.  (Defendants' Responses to Requests for Admission No. 1, 2, 3, 4, 5, 14).

16.  The "Indirect Cost" calculation in the final, 2009 TCM rate was set at 10% of the direct staff wage.  (Pugatch, Ex. D-14).

II.  **Under the Relevant Legal Standard, the Court Should Enter Summary Judgment on the Liability Aspects of Plaintiffs' Claim That the Reimbursement Rate Violates 42 USC §1396a(a)(30).**

The summary judgment standard is familiar to this Court: where a party moves for summary judgment, "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  F.R.C.P. 56(c).  Where, as here, the party moving for

summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992), citing *International Short Stop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991); *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J. dissenting). Once the moving party meets its burden, the non-moving party must come forward with evidence refuting the moving party's case, i.e., submit evidence sufficient to create a genuine issue of material fact such that a reasonable trier of fact could find in the non-moving party's favor. *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1409 (9th Cir. 1995); *California Architectural Building Products v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir. 1987), citing *Celotex*, 477 U.S. at 323 and *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-252 (1986). Applying these standards, the Ninth Circuit has had little difficulty granting summary judgment in favor of moving party plaintiffs or defendants who bore the burden of proof on issues and claims at trial. *United States v. Carter*, 906 F.2d 1375 (9th Cir. 1990); *Watts v. United States*, 703 F.2d 346 (9th Cir. 1983); *Bank Melli Iran*, 58 F.3d at 1413.

**III.     The Undisputed Facts Demonstrate That Defendants Have Set Reimbursement Rates in Violation of Federal Law, Rendering Such Rates Entirely Preempted.**

The undisputed evidence shows that the reimbursement rate applied as of July 1, 2009 for service coordination for developmentally disabled children and adults was a radical change from prior reimbursement methods utilized by the Department of Health and Welfare. The new rate, although following several years of cost studies, was not actually based upon responsible cost studies, and is not based on any reasonable relationship to the cost of providing services. As a result, utilization of the rate violates federal law.

7.  Memorandum in Support of Motion for Summary Judgment

### A. Plaintiffs Have Standing to Bring Suit and the Court Has the Power to Provide Injunctive Relief.

Because each of the Plaintiffs has been and will continue to be directly injured by the reimbursement changes, they have standing to challenge the State's actions under the Supremacy Clause of the U.S. Constitution. *See, e.g., Independent Living Ctr. of So. Cal., Inc. v. Shewry,* 543 F.3d 1050, 1065 (9th Cir. 2008) (reversing district court and recognizing that Medicaid providers had standing under the Supremacy Clause to seek injunctive relief to halt implementation of a Medicaid rate reduction). Even in the absence of a specific, statutory cause of action, a cause of action directly under the Supremacy clause exists to challenge state action. *See, e.g., id.* at 1058; *Bud Antle, Inc. v. Barbosa,* 45 F.3d 1261, 1362 (9th Cir. 1994); *City of Auburn v. Qwest Corp.,* 260 F.3d 1160, 1175-76 (9th Cir. 2001), *cert. denied,* 534 U.S. 1079 (2002).

Where a party seeks injunctive and prospective relief, as Plaintiffs do here, the Eleventh Amendment imposes no bar to Federal Court jurisdiction or power. *Seminole Tribe v. Florida,* 517 U.S. 44 (1996); *Edelman v. Jordan,* 415 U.S. 651 (1974); *Ex Parte Young,* 209 U.S. 123 (1908). *Ex Parte Young* also requires "a connection between the official sued and enforcement of the allegedly unconstitutional statute." *Long v. Van de Kamp,* 961 F.2d 151, 152 (9th Cir. 1992). Idaho's Medicaid program is administered by the Defendants Armstrong and Clements in their official capacities as Clements administers the Medicaid program under the direction and supervision of Armstrong.

### B. Continued Use of the Current Reimbursement Rate Violates Federal Law.

#### 1. Idaho's Medicaid System is Governed by Federal Law.

Once a state chooses to participate in Medicaid, the state must comply with the requirements of the Act. *Alexander v. Choate,* 469 U.S. 287, 290 n.1, 83 L. Ed. 2d 661, 105 S. Ct. 712 (1985). To qualify for federal funds, a state must submit a plan to the Secretary of

8. Memorandum in Support of Motion for Summary Judgment

Health and Human Services which complies with 58 subsections outlined in 42 U.S.C. § 1396a(a). The state plan must include a system of reimbursing costs that are incurred by health care providers in providing services to Medicaid recipients. Under § 1396a(a)(30)(A) ("Section 30(A)"), a state plan must:

> provide such methods and procedures relating to . . . the payment for[] care and services . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]

The Ninth Circuit has made clear that 42 USC 1396a(a)(30) imposes both "substantive and procedural requirements." *Independent Living Center v. Maxwell-Jolly,* 572 F.3d 644, 651 (9th Cir. 2009). One of the procedural requirements is the use of "responsible cost studies." *Id.* Performing cost studies is a necessary but not sufficient condition. In addition to performing or reviewing such studies, the Ninth Circuit has held the Medicaid statute to require (in a case involving Medicaid reimbursement rates for hospital outpatient treatment) that the state "must set hospital outpatient reimbursement rates <u>that bear a reasonable relationship</u> to efficient and economical hospitals' costs of providing quality services." *Orthopaedic Hospital v. Belshe,* 103 F.3d 1491, 1496 (9th Cir. 1997)(emphasis added); *Alaska Dept. of Health & Soc. Svcs. v. CMS*, 424 F.3d 931 (9th Cir. 2005) .

> **2.    The Cost Studies Performed and Relied Upon by the Idaho Department of Health & Welfare Were Neither Responsible Nor Adequate to Satisfy the Requirements of Federal Law.**

In order to avoid preemption by federal law, the Department must demonstrate that it relied on "responsible cost studies" prior to setting its reimbursement rates. *Independent Living Center,* 572 F.3d at 651. The only cost studies utilized were those performed by the Department of

9.  Memorandum in Support of Motion for Summary Judgment

Health and Welfare and its contractor Johnson, Villegas-Grubb and Associates. The flaws in those studies were numerous, as described by economist Greg Green.

Mr. Green reviewed the studies and concluded that they suffered from several serious flaws. The first flaw was that the Department performed a cost study of a reimbursement system that no longer exists. The second was that the study itself was inadequate to yield usable data.

From 2005 through 2008 the Department of Health and Welfare performed a study or studies of the then-existing costs of providing case management services. (Pugatch, para. 7-20). Following this study, the Department then changed the entire cost structure of case management providers by changing the reimbursement method from a flat rate to an hourly rate at least as to services for developmentally disabled children and adults. In doing so, as described by Greg Green "[s]ome basic economics seems to have been forgotten" by the State. (Green, Ex. 2, p. 3). The Department studied costs arising under the old billing system, but tried to use those studies to justify a new billing structure which had the effect of radically changing the costs faced by providers. In Dr. Green's words "As soon as the new business model was introduced the cost analysis done by the state was irrelevant, as the outcome of the State's analysis was based on a production, cost and revenue relation that no longer existed." (Id.). In other words, while the Department's cost studies and those of its contractor might have been a responsible approach to determining costs of service providers under the old flat rate billing system, and might have provided a legally sufficient basis for setting a new flat reimbursement rate, it was not a study that had any relevance whatsoever in setting an hourly reimbursement rate that would result in far higher costs for service providers. This was precisely the problem identified by the Ninth Circuit in *Dominguez v. Schwarzenegger,* 596 F.3d 1087 (9th Cir. 2010), in

10.  Memorandum in Support of Motion for Summary Judgment

affirming an injunction against a change in reimbursement rate methodology for home health services.

In that case, the State of California had reduced its share of a reimbursement rate that was paid by the state, by counties, and by the federal government under Medicaid. The State attempted to rely on a comprehensive report of the home health services system that it had prepared some time prior to its implementation of reduced reimbursement rates. The Ninth Circuit was unconvinced: "Nowhere does the 2008 Report contain any references to [the proposed rate reduction] let alone 'study the impact of the contemplated rate change(s) on the statutory factors *prior to* setting rates, or in a manner that allows those studies to have a meaningful impact on rates before they are finalized.'" 596 F.3d 1087, 1097, quoting *California Pharamacy Assn. v. Maxwell-Jolly,* 596 F.3d 1098 (9th Cir. 2010).

*California Pharmacy Assn.*, decided the same day as *Dominguez* made even clearer that the state has the obligation to study the effects of a new reimbursement method, prior to implementing that method, rather than relying on old cost studies performed under a different reimbursement scheme:

> We have now handed down multiple decisions instructing the State on § 30(A)'s procedural requirements. We trust that the State now understands that in order for it to comply with § 30(A)'s "requirement that payments for services must be consistent with efficiency, economy, and quality of care, and sufficient to ensure access," *Orthopaedic II*, 103 F.3d at 1500, it must: (1) "rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting," *id*. at 1496; *and* (2) study the impact of the contemplated rate change(s) on the statutory factors *prior to* setting rates, or in a manner that allows those studies to have a meaningful impact on rates before they are finalized.

596 F.3d 1098, 1115. In this case, Idaho studied the old reimbursement rate based on a flat monthly payment, but did not perform any studies of the new hourly reimbursement system that it imposed on July 1, 2009.

11.  Memorandum in Support of Motion for Summary Judgment

The second major flaw in the studies themselves was an effective sample size of only sixteen providers. (Green, Ex. 2, p. 3). The State sent cost surveys to 244 Case Management providers in 2005. (Pugatch, para. 8). It attempted to obtain additional survey responses in 2006, 2007, and 2008. (Pugatch, para. 9-19). Ultimately, the State had cost data from a total of twenty case management providers. (Green, Ex. 2, p. 3). Only sixteen of those providers provided "enough data to analyze the cost" of providing service. (Id.). Only twelve provided enough data to permit analysis of administrative costs. (Id.). Such a small sample size would only be statistically valid is if "twenty represents the entire population of Idaho's TCM service providers." (Id.). In fact, as Sheila Pugatch pointed out, the population includes at least the 244 providers to whom the Department sent surveys.

According to Green, a sample size of sixteen is "small by any standard." (Id.). While the Ninth Circuit has not expanded upon what it considers a "responsible cost study," it does require that usch a study provide "reliable data." *California Pharmacy Association,* 596 F.3d 1098, 1115. There is no standard available by which a sample of sixteen providers would be responsible or reliable, and it cannot be considered "responsible" to study one cost system and then impose an entirely different cost system. By failing to perform and rely upon "responsible cost studies" prior to setting reimbursement rates the Defendants have violated the requirements of federal law.

### 3. The Department's Reimbursement Rate Is not Reasonably Related to the Costs of Providing Service.

Medicaid reimbursement rates must be related to the cost of providing the services unless there is some justification other than merely budget concerns for not reimbursing providers at that rate. *Orthopaedic Hospital,* 103 F.3d 1491, 1499; *see also Arkansas Med. Soc 'y, Inc. v. Reynolds,* 6 F.3d 519, 530-31 (3d Cir. 1993). But the rates currently set by the Idaho Department

12.  Memorandum in Support of Motion for Summary Judgment

of Health and Welfare are not based on the current costs of providing services (which have not been studied), and are not even reasonably related to the actual costs established in the Department's own studies.

As discussed by Dr. Green, the State of Idaho studied the costs of service providers under the old reimbursement method, which was a flat rate for any month in which services were provided. The failure to "study the impact of the contemplated rate change(s) on the statutory factors *prior to* setting rates" is absolutely fatal to new rates. *California Pharmacist Assn. v. Maxwell-Jolly,* 596 F.3d 1098, 1115 (9th Cir. 2010). Continued implementation of this reimbursement method violates federal law.

Perhaps worse is that the reimbursement method established by Idaho is not even reasonably related to the old cost structure which it did study. For a period of at least three years, Idaho collected and analyzed data on the costs of case management service providers. (Pugatch, para. 7-20). It then purported to base a new (hourly) reimbursement rate on that data. The new reimbursement rate was based upon an hourly wage rate with a series of multipliers applied to that wage rate to arrive at a final rate. (Pugatch, Ex. D-14). The calculation system is actually quite simple and based on the following:

| | |
|---|---|
| Direct Care Staff Wage | $22.21 |
| Adjusted for Inflation at 3.53% | $0.76 |
| Employment Related Expenditures at 20.2% | $4.48 |
| Adjusted for Inflation at 1.87% | $0.08 |
| Non-Productive Direct Care Staff Time at 32.2% | $7.40 |
| Mileage (8.79 miles per hour of staff time at .39/mile) | $3.43 |

13.  Memorandum in Support of Motion for Summary Judgment

| | |
|---|---|
| Paid Leave Time for Direct Care Staff at 5.9% | $1.36 |
| Indirect Costs at 10% | $3.97 |
| TOTAL | $44.16 per hour |

This is the calculation actually used by the Department to establish the hourly reimbursement rate. (Pugatch, Ex. D-14). The calculation notes its own flaw when it provides that "Future provider survey need to account for indirect costs incurred by providers." (Pugatch, Ex. D-14). That is not a complete statement of the flaw, however. The Department did perform provider surveys which yielded data (unreliable as it was) on the indirect costs incurred by providers. As Dr. Green explains, "any cost that is not accounted for in the previous paragraph[s] would come under the heading Indirect Costs." (Green, Ex. 3, p. 5). Dr. Green makes the assumption that the State's cost study results, reported in Exhibit D-13 to the Declaration of Sheila Pugatch, actually capture all of the costs of providing case management services. (Id.). While this assumption is questionable based on the flaws in the study itself, it gives the benefit of the doubt to the Department. The total indirect costs identified by the Department's cost studies includes some portion of mileage, which is accounted for separately in the Department's final rate calculation. (Id., p. 6). Dr. Green then applies various assumptions as to the portion of transportation costs (which were aggregated in the Department's study in indirect costs) that are represented by mileage. (Id.). The assumption that is most beneficial to the Department's rate calculation is that the mileage line of the rate calculation actually captures 100% of the "transportation" costs that are included in the aggregated indirect costs found by the study. (Id.). Even if that is the case, in other words, even if the most beneficial possible inference is made in the Department's favor, the State's own studies demonstrate that Indirect Costs amount to at least 32.2% of the cost of direct care staff wages, and possibly as much as

14.  Memorandum in Support of Motion for Summary Judgment

40.7%. (Green, Ex. 2, p. 7). The Department, however, calculated its rate on the assumption that Indirect Costs amounted to only 10% of direct care staff wages (Pugatch, Ex. D-14) resulting in an understatement of costs from 22.2 to 30.7%.

Dr. Green's analysis is actually less damning than the Defendants' own admissions made in discovery in this case. In response to requests for admissions, Defendants Armstrong and Clement confirmed that all program-related expenditures, salaries of program administrators, employment related expenses of administrators, lease or rental costs, depreciation and amortization, interest on capital debt, real estate taxes, property insurance, and supplies, materials and equipment costs were all included in the "Indirect Cost" category of the TCM rate calculation. (Defendants' Responses to Requests for Admission No. 1, 2, 3, 4, 5, 14, Ex. 1 to Supplemental Declaration of Piotrowski).

The Defendants have also admitted that 10% of direct care staff wages is entirely inadequate to cover all of those expenses. Defendants admit that its own cost studies demonstrate that the cost of program supervision came to 24,28% of direct care staff wages; that administrative staff costs came to 21.93% of direct care staff wages; that supplies, materials, transportation and equipment expenses came to 19.78% of direct care staff wages; and, that building expenses came to 13.45% of direct care staff wages. (Defendants' Response to Requests for Admission No. 6, 7, 8, 9). The combination of all of these expenses, as established by the Department's own cost studies is that these expenses together constitute 79.53% of direct care staff wages. IDH&W, however, included only a 10% multiplier for indirect costs in its rate calculation, understating the actual cost by 69.53%.

Nothing in the Department's rate studies or rate calculation explains why anywhere from 22% to 69% of the provides' actual costs are ignored in the 2009 final rate calculation. In short,

15. Memorandum in Support of Motion for Summary Judgment

the final rate calculation does not bear any relationship to the actual costs of service identified by the Department's own cost studies.

**IV. The Court Should Order Further Proceedings to Determine Appropriate Remedies.**

Even at the preliminary injunction stage, this Court concluded that Plaintiffs would suffer irreparable harm under the new reimbursement methodology. (Memorandum Decision and Order, Dkt. 32, pp. 15-17). Plaintiffs now seek a final decision on the merits of their claim that the reimbursement rates violate federal law. Fashioning an appropriate remedy for such a violation is, Plaintiffs admit, a difficult process.

At the preliminary injunction stage this Court concluded that the equities tipped in favor of the Defendants because "IDHW's concern with complying with federal law overrides Plaintiffs' financial concerns, especially in light of the Court's finding that Plaintiffs are not likely to succeed on the merits of their claim." (Memorandum Decision and Order, p. 15). If the Court concludes, as it should, that implementation of changed reimbursement methods without first undertaking studies addressing the effects of that method also violates federal law, the Defendants find themselves in an untenable position. On the one hand, they are required to comply with their own Medicaid plan as approved by CMS. On the other, they are required to comply with 42 USC 1396a(a)(30)(A).

Plaintiffs would likely request a permanent injunction directing Defendants to request a Medicaid Plan Amendment restoring the previous reimbursement rates for Service Coordination benefits for the developmentally disabled within a reasonable period of time (e.g., 30 days), and to apply those rates at the earliest date that CMS will permit the State to do so. Such an injunction would raise no risk of putting the State out of compliance with its own Medicaid Plan, and also ensures that the State will take immediate steps to be in compliance with §1396a.

16.  Memorandum in Support of Motion for Summary Judgment

However, Plaintiffs also recognize that this case raises difficult issues of comity to state government and to another branch of the federal government (Department of Health and Human Services and its Center for Medicare and Medicaid Services). Rather than request a remedy at this point, Plaintiffs request, for all the reasons set out in this Memorandum a summary judgment that the current reimbursement rate violates federal law, and an order for further proceedings to determine an appropriate remedy.

DATED this 29th day of October, 2010.

                                    HERZFELD & PIOTROWSKI, LLP

                                    _____/s/_____
                                    James M. Piotrowski
                                    Marty Durand
                                    Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that I have caused a true and correct copy of the foregoing to be served upon the individuals identified below via CM/ECF filing:

Peg Dougherty, Deputy Attorney General
450 W. State Street, 10th Floor
P.O. Box 83720
Boise, Idaho 83702-0036

Dated this 29th day of October, 2010.


_____/s/_____
James M. Piotrowski

18.  Memorandum in Support of Motion for Summary Judgment