LAWRENCE G. WASDEN
ATTORNEY GENERAL
STATE OF IDAHO

PEG M. DOUGHERTY, ISB #6043
Lead Deputy Attorney General
Contracts & Administrative Law Division

CHARINA A. NEWELL, ISB #6783
Deputy Attorney General
Contracts & Administrative Law Division
450 W. State Street – 10th Floor
PO Box 83720
Boise, ID 83720-0036
Telephone: (208) 334-5537
Fax: (208) 334-5548
newellc@dhw.idaho.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITY SERVICE COORDINATION, INC., A REFERRAL AND INFORMATION SERVICE, LLC, S.O.A.R., INC., COORDINATED CARE SERVICES, LLC, UNBEFUDDLED, LLC, LLOYD BRINEGAR SHORT & ASSOCIATES, LLC<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD ARMSTRONG, and LESLIE CLEMENT, in their official capacities,<br><br>Defendants. | Case No. 09-CV-00639-BLW<br><br>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT |

COMES NOW Defendants, by and through their attorneys of record, Peg M. Dougherty and Charina A. Newell, Deputy Attorneys General, and file this Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment. This Memorandum is filed concurrently with and is supported by the

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT - 1

Affidavit of Sheila J. Pugatch in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment ("Pugatch Aff. II") and the Affidavit of John Villegas-Grubbs.

## I. INTRODUCTION

The Defendants, Richard Armstrong, Director of the Idaho Department of Health and Welfare ("the Department"), and Leslie Clement, Division Administrator of the Department's Division of Medicaid, are being sued in their official capacity. After several years of costs studies and analysis, the Department developed and implemented a new billing method for a Medicaid covered benefit referred to as Service Coordination.[1] The service coordination providers ("Plaintiffs") are seeking permanent injunctive relief alleging that the new billing method violates federal law.

In March 2010, after hearing oral argument on the Plaintiffs' motion for a preliminary injunction, the Court entered an Order denying the motion. *Memorandum Decision and Order* (Docket No. 32). Plaintiffs failed to prove a likelihood of success on the merits of their claim that the Department violated the elements of 42 U.S.C. §1396(a)30A, that the balance of equities tip in their favor, and that an injunction would be in the public interest.

In their motion for summary judgment, Plaintiffs are repeating their argument from their motion for preliminary injunction that the cost studies do not bear a reasonable relationship to the cost studies undertaken by the Department. However, the evidence they present in support of this contention is based on erroneous information and assumptions, and Plaintiffs' motion should be denied. To the contrary, the Department complied with all of the requirements imposed by

---

[1] Service Coordination may also be referred to as Case Management or Targeted Case Management (TCM); however, for purposes of this brief, the benefit at issue will be referred to as "Service Coordination." It encompasses assistance given to Medicaid eligible individuals to gain access to and coordinate necessary care and services appropriate to the needs of the individual.

federal and state law to develop and implement the change in reimbursement methods and is therefore entitled to summary judgment as a matter of law.

## II. SUMMARY OF UNDISPUTED FACTS

The facts underlying this case were thoroughly discussed in Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction[2] and supported by the Affidavits of Sheila Pugatch[3] and David Simnitt[4] and the exhibits attached thereto. For purposes of the cross-motions for summary judgment, the factual background presented for the preliminary injunction is thereby incorporated herein. In addition, Defendants submit the second Affidavit of Sheila Pugatch in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment and the Affidavit of John Villegas-Grubbs in support of this memorandum.

## III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. 56(c). "To withstand summary judgment, the [nonmoving party] must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable factfinder to enter a verdict in the non-moving party's favor. *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). When parties submit cross-motions for summary judgment, the court must "evaluate each motion separately, giving the nonmoving

---

[2] Docket No. 13.
[3] Docket No. 15.
[4] Docket No. 14.

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT - 3

party in each instance the benefit of all reasonable inferences." *U.S. ex rel. Putnam v. Eastern Idaho Regional Medical Center*, 696 F.Supp.2d 1190, 1194-95 (D.Idaho 2010) (citing *ACLU of Nev. v. City of Las Vegas,* 333 F.3d 1092, 1097 (9th Cir.2003)). "[W]hen the nonmoving party has the burden of proof at trial, as Plaintiffs do here, the party moving for summary judgment, in this case the State, need only point out that there is an absence of evidence to support the nonmoving party's case." *Farrakhan v. Gregoire*, 590 F.3d 989, 1003 (9th Cir. 2010) (citing *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001) (en banc)).

> When an action will be tried before the court without a jury, the trial court as the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences. Resolution of the possible conflict between the inferences is within the responsibilities of the fact finder.

*P.O. Ventures, Inc. v. Loucks Family Irrevocable Trust*, 144 Idaho 233, 237, 159 P.3d 870, 874 (2007) (citation omitted).

### III.  ARGUMENT

**A.  Plaintiffs' Have Failed to Prove They Are Entitled to Judgment as a Matter of Law.**

The initial and supplemental reports submitted by the Plaintiffs' expert witness, Gregory Green, Ph.D., contend that there are two main flaws in the cost study. First, the cost study was done on a reimbursement system that no longer exists, and second, that the study itself was inadequate to yield usable data. However, each alleged flaw is based on false assumptions made by Dr. Green and therefore, the conclusions made in his reports are erroneous.

### a. The Department exceeded the standard set in *Orthopaedic* to conduct reasonable cost studies.

Plaintiffs' argue that the costs studies performed by the Department were not "responsible" to satisfy the requirements of federal law. Plaintiffs' Memorandum in Support of Motion for Summary Judgment, pg 12. This is untrue. The Department relied upon the best data that could be obtained to determine what a service coordination provider's costs were prior to setting the rate. Plaintiffs simply cannot prevail on a claim that the Department failed to use responsible and sound cost studies.

The Ninth Circuit has interpreted the substantive and procedural requirements for changes in rates paid for Medicaid services as requiring the state to set reimbursement rates that "bear a reasonable relationship to efficient and economical [providers'] costs of providing quality services, unless the Department shows some justification for rates that substantially deviate from such costs." *See, e.g., Ind. Living Ctr. of So. Calif, Inc. v Maxwell-Jolly*, 572 F.3d 644, 651-52 (9th Cir.2009), quoting *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491, 1496 (9th Cir.1997). To meet this requirement, the Court has held that the State "must rely on responsible cost studies, its own or others' that provide reliable data as a basis for its rate setting." *Id.* In *Orthopaedic*, the seminal case relied upon by the Ninth Circuit, the court explained, "[f]or payments to be consistent with efficiency, economy and quality of care, they must ***approximate*** the cost of quality care provided efficiently and economically. ... ***Judgments can be made*** as to the efficiency of the providers, the economies they practice and the quality of the services they deliver, but costs are an integral part of the consideration." *Orthopaedic* 1103 F.3d at 1496 (emphasis added).

Dr. Green states repeatedly throughout his report that the reimbursement rates were estimated using cost data associated with the "old business model and not the costs associated with the new business model." Green Declaration (Docket No. 36-2), Ex. 2 ("Green Report"), pg. 2, ¶2; *see also* Green Report, pg. 2, ¶¶3-4; pg. 6, ¶¶1-3; pg. 7, ¶2; and pg. 12, Section 3.3. Dr. Green's assumption that billing in 15-minute increments is a "new business model" is mistaken. To the contrary, the Department paid for targeted care management (TCM) to mental health (MH) and personal care services (PCS) TCM providers in 15-minutes increments prior to and following the implementation of the "new business model" on July 1, 2009. Pugatch Aff. II, ¶4. Such TCM services are the same as the TCM services for the Plaintiff providers. Not only was this reimbursement method used prior to July 1, 2009, but cost data using this reimbursement method was included in the cost studies. *Id.* The MH and PCS providers who responded to the survey provided information that constituted 40% of the total expenses of all the providers in the survey, which is shown in the spreadsheet attached to Pugatch Aff. II as Exhibit 1. Thus, Plaintiffs' assertion that the Department changed its entire cost structure and neglected to take the new structure into account in establishing its reimbursement is simply not true.

Dr. Green attacks the new reimbursement rates as "too low given the increase in costs associated with the new business model." Green Report, pg. 2, ¶2. He further states in his supplemental report that the "TCM reimbursement rate for indirect cost is understated." Supplemental Green Report, Ex. 3 to Green Declaration, pg. 8. He argues that the only provider cost considered in the reimbursement methodology for TCM is labeled "indirect cost" at ten percent (10%). *See* Exhibit D-14 to the Affidavit of Sheila Pugatch (Docket 15). This is untrue. As shown by Exhibit 1 to Pugatch Aff. II, the sum of all costs, both compensation and expenses, of those responders to the survey equals $2,590,923. All of the cost information submitted by

providers, excluding the direct care staff total cost of $1,443,678 ($1,046,502 and $397,176), equals $1,146,919. Thus 44.3% of total costs reported in the survey represent expenses other than salaries for professionals and para-professionals. In Exhibit D-14 to the Affidavit of Sheila Pugatch (Docket 15), which details how the professional service coordinator reimbursement rate of $11.04 per unit is calculated, 47.9% of the total rate is comprised of all other costs – direct care staff employment related expenditures, non-productive direct care staff time, mileage cost, paid leave time for direct care staff time, and indirect costs – besides direct care staff costs. In addition, upon review of Exhibit D-14 which details how the paraprofessional service coordinator reimbursement rate of $5.99 per unit is calculated, 46.8% of the total rate is comprised of all other costs – direct care staff employment related expenditures, non-productive direct care staff time, mileage cost, paid leave time for direct care staff time, and indirect costs – besides direct care staff costs. Thus, for professional and para-professional service coordinators, the Department rates reflect expenses at 47.9% and 46.8% respectively, which is greater than the 44.3% of cost data submitted by providers. Therefore, the reimbursement rate is not too low nor is the indirect cost understated.

Plaintiffs claim that "nothing in the Department's rate studies or rate calculations explains why anywhere from 22% to 69% of the providers' actual costs are ignored in the 2009 final rate calculation." Plaintiffs' Memorandum in Support of Motion for Summary Judgment (Docket 36-1), pg. 15. The 10% rate for indirect costs was previously explained in the Affidavit of Sheila Pugatch, ¶23-24. Docket 14. The 10 percent general and administrative cost percentage used is the maximum allowed by CMS without further supporting data. See Pugatch Aff., Exhibit D-8, p. 57. As Pugatch explains in her first affidavit, the JVGA[5] Report, dated

---

[5] Johnston, Villegas-Grubbs & Associates LLC (JVGA) is the expert consulting firm hired by the Department to assist with cost studies and development with the reimbursement methodology. *See* Pugatch Aff., ¶19, Dkt. No. 15.
DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT - 7

January 2008, found that general and administrative expenditures accounted for only 7.7% of overall provider costs in Idaho. Pugatch Aff., ¶23. Because CMS requires further supporting data to use a different rate and Pugatch felt that there was not enough information and data to justify setting the rate at 7.7%, therefore, the maximum-allowable rate of 10% was chosen. *Id.*

In fact, Dr. Green's report contains too many invalid assumptions and erroneous facts to conclude that his analysis is valid. For example, Dr. Green critiques the size of the data set used to estimate the reimbursement rate. Green Report, pg. 3, ¶ 2. However, with the exception of mileage data gathered, the data set size was irrelevant because it was not used in the rate reimbursement methodology calculation. Pugatch Aff. II, ¶ 6. Additionally, Green mistakenly asserts that transportation services are treated differently in the new method and that paraprofessionals are required to attend training conferences every 90 days. In fact, there is no such requirement for paraprofessionals in the rules governing TCM. Pugatch Aff. II, ¶¶ 7-8.

Finally, Dr. Green also criticizes having a single reimbursement rate for all service providers because such a rate does not incorporate "special dimension" in the analysis, referring to the cost of doing business in a rural versus a metropolitan area. Green Report, pg. 3, ¶3. However, the JVGA report refutes this:

> The system should compensate at the same level for the same specific service, regardless of the provider agency. This means that when two agencies are providing the same service in the same way, with the same financial pressures (demographic considerations, etc.) they should be paid the same amount.

2006 JVGA Report, pg. 12, Exhibit D-3 to the Affidavit of Sheila Pugatch (Docket 15). Instead, the three primary demographic- sensitive components – transportation, housing, and wages are considered when conducting the rate study. Aff. of John Villegas-Grubbs, ¶ 5. Villegas-Grubbs further states:

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT - 8

> The three primary demographic - sensitive components, when pressured by differences tend to offset each other, however, in the overall expense picture. In rural areas where transportation costs run high, housing and wages tend to be less...and the other way around. Because introducing differentials into standardized rate architecture adds a significant element of complexity, we generally do not resort to them unless we absolutely have to ....

Id. at ¶ 8. Thus, Dr. Green's assertions are based on the false premise that demographic considerations were not included in the cost studies, when in fact, they were. His mistakes of fact and assumptions are repeated throughout his reports; therefore, it is a reasonable inference that the conclusions drawn from his report and supplemental report are not credible. Plaintiffs have failed to establish that the costs studies were not based upon reliable data and that the rate set is not reasonably related to the costs of providing service. Their motion for summary judgment must be denied.

### b. The California line of cases are distinguishable from the current case.

The caselaw relied upon by Plaintiffs is distinguishable from the case at hand. Specifically, Plaintiffs cite to *Orthopaedic, supra; Ind. Living v. Shewry*, 543 F.3d 1050 (9th Cir.2008); *Ind. Living v. Maxwell-Jolley, supra; Dominguez v. Schwarzenegger*, 596 F.3d 1087 (9th Cir. 2010); and *California Pharmacy Ass'n v. Maxwell-Jolly*, 596 F.3d 1098 (9th Cir. 2010) to support their contention that the Department's reimbursement methodology does not reflect responsible cost studies. In each of those cases the agency, California's Department of Health Services responded to statutes passed by the California legislature requiring a reduction in reimbursement rates by a fixed percentage set by the legislature. The state agency was unable to demonstrate that it considered any reliable cost studies when adjusting its reimbursement rates. These cases are clearly unlike the case at hand where multiple cost studies were undertaken and the legislature did not mandate an across the board cut in rates. Moreover, several of those cases

also involve mandatory costs reporting requirements imposed by statute for the providers in question, resulting in auditable reports from all providers of the type in question.

Furthermore, in *Dominguez, supra*, the report deemed inadequate by the court was not a cost study that analyzed current rate methodology, but a report required on an annual basis for the agency to give to the legislature. The report in question did not include any discussion regarding the possibility of rate change. *Id.* at 1097. "Nowhere does the 2008 Report contain any references to § 12306.1(d)(6), let alone 'study the impact of the contemplated rate change(s) on the statutory factors prior to setting rates, or in a manner that allows those studies to have a meaningful impact on rates before they are finalized.'" *Id.* Here, the Department is not attempting to rely upon such a report. To the contrary, the Department has conducted its own rate studies for the past five years, hired outside consultants who specialize in the design of rate methodologies for Medicaid providers, utilized specific provider data and Idaho specific industry data to develop a customized rate methodology for service coordination providers. As explained in Pugatch Aff. II, those costs studies included data provided by MH and PCS providers who were already paid via the new reimbursement method in 15-minute increments. Furthermore, the Department's consideration of the impact on providers' costs is evident throughout its five year study, as discussed in greater detail below in Section C, subparagraph (b). The Department utilized the best data it could obtain to determine what service coordination provider's costs were prior to setting the rate. A stark contrast exists between the multi-year cost study analysis and collaborative process undertaken by the Department and the across-the-board rate reductions made by the California legislature in the case law provided by Plaintiffs.

The Department exceeded the standard set in *Orthopaedic* to conduct reasonable cost studies. Plaintiffs simply can not prevail on a claim that the Department failed to consider

whether the rate bore a reasonable relationship to an efficient and economical service coordination agency's costs

### B.     The cost survey data set is small due, in part, to Plaintiffs' actions.

Plaintiffs' expert contends that the Department cost studies are unreliable because the resulting data set was too small. Plaintiffs' Memorandum in Support of Motion for Summary Judgment, pg. 12. However, Plaintiffs played a direct role in the data set being as small as it was. None of the Plaintiffs participated in all of the surveys from 2005 through 2009, and only four of the Plaintiffs participated in the 2009 time study. Pugatch Aff. ¶¶8, 14, and 21 (Docket 15). Plaintiffs' non-participation in the survey relates directly to their complaint that the reimbursement rates set by the Dept. do not reflect their costs. The doctrine of unclean hands is applicable to the Plaintiffs' conduct here.

> "The doctrine [of unclean hands] bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir.1989) (citations omitted). ... " 'It is fundamental to [the] operation of the doctrine that the alleged misconduct by the [party] relate directly to the transaction concerning which the complaint is made.' " *Dollar Sys.*, 890 F.2d at 173 (quoting *Arthur v. Davis*, 126 Cal.App.3d 684, 693-94, 178 Cal.Rptr. 920 (Cal.Ct.App.1981)). "[U]nclean hands does not constitute 'misconduct in the abstract, unrelated to the claim to which it is asserted as a defense.' " *Jarrow*, 304 F.3d at 841 (citing *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir.1963)).

*Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.*, 621 F.3d 981, 986 - 87 (9th Cir. 2010). Unlike the providers in *Orthopaedic*, service coordination providers are not mandatory cost reporters, thus the Department must rely on the providers' voluntary participation and accurate disclosure of their costs and upon reliable statistical data. By attacking the cost studies for having inadequate sample size when they all refused to take part in

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT - 11

them, the Plaintiffs' conduct has contributed directly to the result they know complain of. Accordingly, Plaintiffs should not be allowed to benefit from their previous lack of participation.

### C. The Department Has Fulfilled the Statutory Requirements of § 30A and Is Entitled to Judgment as a Matter of Law.

#### a. CMS' approval of the State Plan Amendments ensured that the Department complied with federal law.

Plaintiffs argue that the new reimbursement method is not reasonably related to costs of providing service. Plaintiffs Memorandum in Support of Motion for Summary Judgment (Docket No. 36-1), pg.12-13. However, as stated in its arguments against the Plaintiffs' motion for preliminary injunction, CMS's approval of the Department's SPAs on the billing methodology for service coordination demonstrates its concurrence that the statutory prerequisites of § 30(A) have been satisfied. Because CMS's determination is entitled to *Chevron* deference, the Defendants have established that they are entitled to judgment as a matter of law.

A state's participation in Medicaid is voluntary, and those states that choose to participate must comply both with statutory requirements imposed by the Medicaid Act and with regulations promulgated by the Secretary of Health and Human Services. *Wilder v. Va. Hosp. Ass'n.*, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513 (1990). A participating state must gain approval of its state plan from the Secretary to qualify for federal assistance, which must fulfill an extensive list of requirements. *See* 42 U.S.C. § 1396a(a) and 42 CFR § 430 *et seq*. A state plan (or an amendment to a state plan) "shall" be approved if it fulfills the statutory regulatory conditions found at 42 U.S.C. § 1396a(b). As long as a state plan meets federal requirements, a state has considerable discretion in administering its Medicaid program, including setting reimbursement methodology and rates. *See Lewis v. Hegstrom,* 767 F.2d 1371, 1373 (9th Cir. 1985).

Section 30(A) of the Medicaid Act, 42 U.S.C. § 1396(a), requires that a State Plan:

> Provide such methods and procedures relating to ... the payment for care and services ... as may be necessary ... to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396(a)(30)(A). Prior to implementing the rate changes at issue, the Department submitted to CMS four State Plan Amendments (SPA) for Service Coordination for each group of participants affected: children, developmentally disabled adults, adults with serious and persistent mental illness, and adults who are eligible to receive personal care services. Simnitt Aff. (Docket 14), ¶ 14, Ex. D-20. Each SPA set forth the scope of service coordination coverage for each population and included the change in reimbursement method from flat monthly rate to 15 minute increments, the rate calculations, the sources for its base rate including the State Occupational Employment and Wage Estimates from the Bureau of Labor Statistics (BLS), a comparable job description for medical and public health social workers, and a BLS table of employer costs per hour worked for employee compensation by census region. Pugatch Aff. (Docket 15), ¶ 24, Ex. D-9. The Department received CMS's approval of the four SPAs on August 27, 2009, with an effective date of July 1, 2009 for each one. Simnitt Aff. (Docket 14), ¶ 14, Ex. D-20.

On October 6, 2009, in response to an Idaho service coordination agency that had written to the Regional CMS office regarding the propriety of IDHW's rule and rate changes for service coordination, CMS stated:

> The State of Idaho, Department of Health & Welfare's action comply with federal regulatory requirements for changing critical components of its Medicaid program. The State recently submitted several State Plan Amendments (SPA) to the Centers for Medicare & Medicaid Services (CMS) for [service coordination] ... which CMS has approved.

Simnitt Aff. (Docket 14), ¶ 15, Ex. D-21.

A court must defer to the federal agency's reasonable interpretation of a statute it is charged with administering. *Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.,* 467 U.S. 837, 842-845, 104 S.Ct. 2778 (1984). *Chevron* deference is required "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law." *United States v. Mead Corp.,* 533 U.S. 218, 226-27, 121 S.Ct. 2164 (2001). Under *Chevron* "if the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842-43, 104 S.Ct. 2778.

In this instance, the Secretary's duty to "ensur[e] that each state plan complies with a vast network of specific statutory requirements" constitutes an "express delegation of specific interpretative authority" that evidences Congress's intent to imbue the "Secretary's determinations with the force of law." *Pharm. Rsch. Mfrs. of Am. v. Thompson,* 362 F.3d 817, 821-22 (D.C.Cir. 2004). Because the Secretary is charged with ensuring that the State complies with this statutory mandate, it follows that she cannot approve a state plan that does not provide such methods and procedures. *Chevron* requires the Court to defer to her interpretation that the statutory prerequisites of § 30(A) have been satisfied. Consequently, Defendants' motion for summary judgment should be granted.

   b. **Economy, efficiency, quality of care, and access to care were considered in the development and in the application of the new reimbursement methodology.**

In support of its decision that the Plaintiffs were unable to show a likelihood of success on the merits of their claim that the Section 30A factors were considered in the development and application of the new reimbursement method, the Court cited to several facts as evidence the

Section 30A factors were considered. These facts are not in dispute, and therefore, the Department is entitled to judgment that the new methodology is in compliance with federal law.

Demonstrating economy and efficiency:

- The cost studies undertaken by JVGA utilized the data provided by service coordination agencies, certified family homes, and the Bureau of Labor Statistics.

- Also, the 2009 survey conducted by the Department requested that service coordinator agencies provide specific data aimed at assessing what percentage of costs were spent on providing direct care to clients versus the percentage spent on their costs, such as administrative staff, program supervision, supplies, materials, transportation, equipment and building related expenses. Memorandum Decision and Order (Docket 32), pg. 8-9.

Demonstrating quality of care:

- The new methodology provides service coordination agencies an incentive to provide at least two hours and twenty-three minutes of services per month to maintain the same level of payment whereas the previous reimbursement method gave agencies the same monthly rate regardless of how much or how little service coordination was provided.

- The new methodology actually increased the amount that agencies can be paid on the monthly basis per participant. Memorandum Decision and Order (Docket 32), pg. 9.

- Plaintiffs submitted insufficient evidence that the new reimbursement method affected the quality of care. Memorandum Decision and Order (Docket 32), pg. 12-13.

Demonstrating access to care:

- The Department determined that the rate change would be budget neutral, so access to care would remain the same. Memorandum Decision and Order (Docket 32), pg. 10.

- Several Department employees report that access to care has not been affected by the new reimbursement method. See Docket Nos. 13-1, 13-2. 13-3, and 13-4. Memorandum Decision and Order (Docket 32), pg. 12.

Plaintiffs bring no evidence or additional facts forward to contest these findings by the Court. In fact, the Plaintiffs have not seen a significant decrease in Medicaid reimbursement payments. Sheila Pugatch compiled data related to the Plaintiffs' billing submitted to the Department during the months prior to and following the implementation of the single rate system. That data is compiled on a spreadsheet attached to Pugatch Aff. II as Exhibit 3. This spreadsheet shows that the number of unduplicated clients that each of the Plaintiffs billed for before and after July 1, 2009 is about the same or increased in numbers. The Plaintiffs did not lose participants to service. The change in paid claims between June 2009 and July 2009 constitute an aggregate decrease of 13% in payments, which is far less than the loss the Plaintiffs have stated. Any argument by the Plaintiffs that the quality of care they provide or access to care by participants were drastically affected by the rate change is simply exaggerated. As such, Plaintiffs are unable to establish that the new reimbursement method violates the Section 30A factors of economy, efficiency, quality of care, and access to care. Therefore, summary judgment is warranted in favor of the Department.

    **c. Plaintiffs' remedy arguments are illogical.**

Plaintiffs request summary judgment on the basis that the current reimbursement rate violates federal law, and indicate that they are likely to seek a permanent injunction that would restore payments under the previous reimbursement method. Plaintiffs' Memorandum in

Support of Summary Judgment, pgs. 16-17. If the court granted the Plaintiffs' request to return to the previous reimbursement method, the Department would be out of compliance with its approved State Plan and in violation of federal law. CMS's approval of the SPAs related to the new rate ensures that the Department is in compliance with federal law, specifically, Section 1396a.

Moreover, such a remedy assumes that the previous reimbursement methodology complies with federal law and Section 30A. There is no evidence that the previous reimbursement methodology contemplates the factors of economy, efficiency, quality of care, and access to care or that it is reasonably related to the costs of providing service. Such a remedy would only create uncertainty and open the Department to more costly litigation.

## IV. CONCLUSION

Plaintiffs have failed to meet their burden proving that the reimbursement rate change violates Section 30A. On the other hand, the Department has shown that it complied with all statutory requirements in developing and applying the new reimbursement methodology, and therefore, it is entitled to judgment as a matter of law.

DATED this 22nd day of November 2010.

OFFICE OF THE ATTORNEY GENERAL

*/s/ Charina A. Newell*
CHARINA A. NEWELL
Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on this _22_ day of November 2010, I submitted the foregoing DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT to the Clerk of the Court for service on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing, including, but not limited to, the following:

James M. Piotrowski  Email: JPiotrowski@idunionlaw.com
Marty Durand  Email: marty@idunionlaw.com
HERZFELD & PIOTROWSKI, LLP

Additionally, a copy of the foregoing was served on the following parties by first class mail, postage prepaid, addressed to:

**None**

_____
Beth Conner Harasimowicz
Legal Secretary