James M. Piotrowski
Marty Durand
HERZFELD & PIOTROWSKI, LLP
P.O. Box 2864
824 West Franklin
Boise, Idaho  83701
Telephone: (208) 331-9200
Facsimile: (208) 331-9201

      Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITY SERVICE COORDINATION, INC., et al, <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD ARMSTRONG, and LESLIE CLEMENT, <br><br> Defendants. <br> _____ | Case No. 1:09-CV-639-BLW <br><br> PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

      Defendants apparently believe that if they can just make the numbers look sufficiently confusing, the Court will rule in their favor.  In actuality, the facts are undisputed and only appear to be so because of the intentional confusion introduced by Defendants' primary witness, Sheila Pugatch.  The undisputed facts show that the Idaho Department of Health and Welfare did a woefully poor study of the costs actually associated with providing Service Coordination services, and even then utterly ignored the results of that study in setting a reimbursement rate, all in contravention of well-established law.

      Because the undisputed facts show that the Defendants ignored their own cost studies, Plaintiffs are entitled to partial summary judgment as to their claims.  For the same reason, because the Defendants' other legal claims are without merit, and because the Defendants failed

1. Memorandum in Opposition to Defendants' Cross-Motion and in Support of Plaintiffs' Motion for Summary Judgment

to timely move for summary judgment, the Defendants' motion for summary judgment should be denied.

> **I. Because, Despite Defendants' Attempts to Convince Otherwise, the Results of the Cost Studies are Clear, Easy to Understand, and Demonstrate That There is Absolutely No Relationship Between the Cost of Services and the Reimbursement Rate Set by the Department of Health and Welfare, Plaintiffs Are Entitled to Partial Summary Judgment.**

Defendants have engaged in statistical sleight-of-hand by, in February, 2010, claiming that their reimbursement rate calculation included a variety of "direct care staff" related expenditures, plus a 10% indirect cost, then in June, 2010 claiming that all of the non-direct care costs were incorporated in "Indirect Cost," and now, in November claiming that the court should somehow treat these "direct care staff" expenditures as including non-direct care costs.

On February 5, 2010, the Defendants filed the first Affidavit of Sheila Pugatch which included Exhibit D-14. Exhibit D-14 was the final rate calculation sheet used by the Department to establish the new reimbursement rate, and Ms. Pugatch set the stage for how the document was developed:

> The data accumulated from the cost and other studies performed in 2005, 2006, 2007, 2008 and 2009, was then analyzed and used to revise the hourly reimbursement rate calculation for professional and para-professional service coordination service providers.

(Pugatch, Dkt. 15, para. 23). Furthermore, Pugatch swore:

> The rate calculation included accounting for costs for direct care staff wages, direct care staff employment-related expenditures, non-productive direct care staff time, mileage costs, paid leave time, and a 10% general and administrative cost percentage increase.

(Dkt. 15, p. 10, Pugatch, para. 23). The statement in Pugatch's first affidavit correlates directly to the categories used in Exhibit D-14 which included "Direct Care Staff Wage," "Direct Care Staff Employment Related Expenditures," "Non-Productive Direct Care Staff Time," "Mileage Cost," "Paid Leave Time for Direct Care Staff Time," and "Indirect Cost." Pugatch also

provided the results of the years of cost studies she claimed the Department had performed, and has reproduced those results once again as Exhibit 1 to Pugatch's current affidavit. That document demonstrates that the Department established the following costs were associated with providing Service Coordination benefits:

> Direct Care Salary - $1,046,502
> Direct Care Paraprofessional Salary – $397,176
> Administrative Staff – $316,858
> Program Supervision/Clinical – $350,490
> Supplies, Materials, Transportation & Equipment – $285,543
> Building Related - $194,230

Based on the earlier Pugatch affidavit, the cost study provided by the Department, and the rate calculation sheet provided by the Department, Plaintiffs served detailed Requests for Admissions in an attempt to fully explain what costs were incorporated in the rate calculation and which were not. Defendants Armstrong and Clement were exceedingly clear on how the costs found in the Department's studies were supposed to be accounted for in the final rate calculation:

> First, "Program-related expenditures are part of the 'Indirect Cost' category." (Defendants' Response to Request for Admission No. 1, Supp. Dec. of Piotrowski, Ex. 1, p. 2);

> Second, "Administrative Salaries are considered General and Administrative Expenditures and are part of the 'Indirect Cost' category." (Defendants' Response to Request for Admission No. 2, Supp. Dec. of Piotrowski, Ex. 1, p. 2);

> Third, "Employment related expenditures such as retirement, social security and Medicare, workers compensation, FUTA, SUTA, and insurance for life, health, and disability are considered General and Administrative Expenditures and are part of the 'Indirect Cost' category." (Defendants' Response to Request for Admission No. 3, Supp. Dec. of Piotrowski, Ex. 1, p. 3);

> Fourth, "Lease or rental costs, depreciation and amortization, interest on capital debt, real estate taxes and property insurance are considered General and Administrative Expenditures and part of the 'Indirect Cost' category." (Defendants' Response to Request for Admission No. 4, Supp. Dec. of Piotrowski, Ex. 1, p. 2);

3. Memorandum in Opposition to Defendants' Cross-Motion and in Support of Plaintiffs' Motion for Summary Judgment

Fifth, "Office equipment is considered a General and Administrative Expenditure and is part of the 'Indirect Cost' category." (Defendants' Response to Request for Admission No. 5, Supp. Dec. of Piotrowski, Ex. 1, p. 3).

In sum, between the February affidavits and exhibits, and the June responses to discovery requests, Armstrong and Clements, acting through their employee Pugatch had made clear that all expenses associated with administration, physical location, insurance, and the like were lumped into the General and Administrative Expenditure category, and were supposed to be accounted for solely by the 10% increase on direct care staff costs shown as the last calculation in Exhibit D-14 which was the final rate calculation spreadsheet. That 10% Indirect Cost was based on a total of $39.74 in various Direct Care Staff expenditures, and so came to $3.97 per hour that was added to the reimbursement rate to account for all of the expenses listed above. (Pugatch, Ex. D-14). The inflation adjusted wage rate that the Department used for this calculation was $22.99. (Pugatch, Ex. D-14). These facts are entirely undisputed.

The question the court must answer to resolve this summary judgment motion (at least on this particular point) is whether those undisputed facts show that there is a "reasonable relationship" between the costs actually found by the Department's cost studies, and the 10% of direct care staff expenses actually utilized by the Department. *Orthopaedic Hospital v. Belshe*, 103 F.3d 1491, 1496 (9th Cir. 1997)(emphasis added); *Alaska Dept. of Health & Soc. Svcs. v. CMS*, 424 F.3d 931 (9th Cir. 2005) .

Again, the Department's own admissions demonstrate that there is no relationship between the costs it found in its studies and the "Indirect Cost" component it used in calculating a rate. From the Defendants' Responses to Requests for Admission:

> "[T]he cost study performed by the Department of service coordinators in 2009 showed that administrative staff costs came to 21.93% of the cost of direct care staff wages;"

4. Memorandum in Opposition to Defendants' Cross-Motion and in Support of Plaintiffs' Motion for Summary Judgment

> "[T]he cost study performed by the Department of service coordinators in 2009 showed that program supervision costs came to 24.28% of the cost of direct care staff wages;"

> "[T]he cost study performed by the Department of service coordinators in 2009 showed that supplies, materials, transportation and equipment expenses came to 19.78% of the cost of direct care staff wages;"

> "[T]he cost study performed by the Department of service coordinators in 2009 showed that building expenses came to 13.45% of the cost of direct care staff wages."

(Defendants' Response to Requests for Admission No. 6, 7, 8, 9, Supp. Dec. of Piotrowski, Ex. 1, p.4-5).  From these responses we learn, through application of the simplest addition, that so-called "General and Administrative Expenditures" were identified by the Department's own study as running to 79.44% of direct care staff wages (21.93 + 24.28 + 19.78 + 13.45=79.44).  Despite this result from the Department's own studies, these General and Administrative Expenditures were lumped together and solely accounted for by the 10% "Indirect Cost" adjustment to direct care staff expenses.  The difference between 10% and 79.44% is never accounted for by the Department in any of Pugatch's affidavits, the affidavits of any other witness, or even the briefing submitted by the Deputy Attorneys General.

While it is true that the Ninth Circuit in *Orthopaedic Hospital* permitted the states to "approximate the cost of quality care," and allows the state to make "[j]udgments . . . as to the efficiency of the providers, the economies they practice and the quality of the services they deliver," 103 F.3d 1491, at 1496, the Idaho Department of Health and Welfare has not made any approximations whatsoever, and has not made any judgments whatsoever.  They performed cost studies which showed that "Indirect Costs" amounted to 79.44% of direct care staff wages, but then only included 10% of direct care staff wages to account for those "Indirect Costs" when they made a final rate calculation.

In her latest Affidavit, Pugatch attempts to take the court down a statistical cul-de-sac in order to avoid this obvious failure in the rate calculation method. She does so by relabeling the various costs that were actually used in the rate calculation as something else. In the face of a summary judgment motion based on her own prior affidavit and the admissions of the Defendants, Pugatch now declares:

> All of the cost information submitted by providers, excluding the direct care staff total costs of $1,443,678 ($1,046,502 and $397,176), equals $1,146,919. This is 44.3% of total costs gathered in the survey. Upon review of Exhibit D-14 to my previous affidavit, which details how the professional service coordinator reimbursement rate of $11.04 per unit is calculated, 47.9% of the total rate is comprised of all other costs (direct care staff employment related expenditures, non-productive direct care staff time, mileage cost, paid leave time for direct care staff time, and indirect cost) besides direct care staff costs.

(Dkt. 39-1, p. 3, Pugatch, para. 5). But this is not how the rate calculation was made. The Department did not study "all other costs" associated with Service Coordination. It studied specified costs, as detailed in Pugatch's own summary presented in Exhibit 1 to Pugatch's current affidavit. The only categories the Department studied, and the amounts those studies found were as follows:

   Direct Care Salary - $1,046,502

   Direct Care Paraprofessional Salary – $397,176

   Administrative Staff – $316,858

   Program Supervision/Clinical – $350,490

   Supplies, Materials, Transportation & Equipment – $285,543

   Building Related - $194,230

Pugatch's statement that "47.9% of the total rate is comprised of all other costs" is simply an error or a lie. Exhibit D-14 shows that the final rate is based solely on direct care staff wages, direct care staff employment related expenditures (including direct care staff

benefits, mileage, paid leave, and non-productive time), and the 10% indirect cost. The latest claim that the other categories (including direct care staff benefits, mileage, paid leave, and non-productive time) somehow account for administrative staff, program supervision, supplies, materials, equipment and building expenses is directly contradicted by the admissions made by Defendants Armstrong and Clement in the written discovery. This direct contradiction, plus the extreme vagueness of Pugatch's current claim (she merely compares percentages without explaining why the comparison is appropriate, relevant or statistically useful), render that claim irrelevant.

      The Ninth Circuit has recently affirmed that while a State is not required to directly implement the results of its cost studies, and that a State may implement Medicaid reimbursement rates that vary from the results of cost studies, it may do so only if the State "shows some justification for rates that substantially deviate from" costs identified in the rate studies. In this case, rather than attempting to justify its deviation from the results of its own cost studies, the Department, through Sheila Pugatch admits that the cost study "was irrelevant because it was not used in the rate reimbursement methodology calculation." (Pugatch, Dkt. 39-1, para. 6). Pugatch's admission may be the most important in this case, it amounts to an admission that although the Department spent four years performing repeated studies of the cost of services, it did not actually utilize those studies when it was time to set a reimbursement rate.

      The undisputed facts, as admitted by Armstrong and Clements are that "Indirect Costs" amount to at least 79% of direct care staff wages, but the current reimbursement rate calculation treats them as only 10% of direct care staff expenditures. This standard fails to meet the requirements of the Medicaid Act, as applied by the Ninth Circuit which requires that

7. Memorandum in Opposition to Defendants' Cross-Motion and in Support of Plaintiffs' Motion for Summary Judgment

there be a "reasonable relationship" between the costs determined by the studies, and the reimbursement rate applied.

**II.   Because the Department of Health and Welfare Did Not Perform or Obtain Responsible Cost Studies, It Had No Basis on Which to Rest its New Reimbursement Rates and the Plaintiffs Are Entitled to Partial Summary Judgment.**

Even if the Department somehow overcame the complete lack of any relationship between the results of its cost studies and the reimbursement rate it actually applied, the studies themselves were deeply flawed.  Existing law requires that the State rely upon "responsible cost studies, its own or others" in establishing reimbursement rates.  *Independent Living Center v. Maxwell-Jolly,* 572 F.3d 644, 651 (9th Cir. 2009).  There is no dispute that the Department performed cost studies.  But the mere existence of such studies does not indicate that the studies are "responsible."  While the Ninth Circuit has so far only reviewed cases in which no cost studies were performed, and has not expanded upon what is required to render a cost study "responsible," the evidence in this case demonstrates first that the Department studies costs under the old reimbursement system without accounting for the fact that a change in reimbursement methods would also change cost structure; and, furthermore, it relied on an extremely small sample size that renders the data from the study entirely unreliable.

The Department's only responses to this critique are to first calim that "the data set size was irrelevant because it was not used in the rate reimbursement methodology calculation," (Pugatch, para. 6), and to then attempt to blame the Plaintiffs for not participating in the studies as fully as the Department would have liked.  The first response is inconsistent with the Department's legal obligation to apply a reimbursement rate that is reasonably related to the costs of providing service.  It is also directly contrary to Sheila Pugatch's prior sworn statement. In February, 2010 Pugatch provided an affidavit in which she swore that:

8. Memorandum in Opposition to Defendants' Cross-Motion and in Support of Plaintiffs' Motion for Summary Judgment

>    The data accumulated from the cost and other studies performed in 2005, 2006, 2007, 2008 and 2009, was then analyzed and used to revise the hourly reimbursement rate calculation for professional and para-professional service coordination service providers.

(Pugatch, Dkt. 15, para. 23).

The second is simply irrelevant.  The Medicaid Act's obligations with respect to setting reimbursement rates run to the State, not to individual providers.  The findings of Plaintiffs' expert, Dr. Greg Green, are straightforward: the Department studied costs arising under the old reimbursement structure, and has not studied costs arising as a result fo the change in reimbursement method; the study did not have a large enough sample to be reliable; and both of these problems were correctable, though they have not been corrected.

As Sheila Pugatch admits, there has been a 13% reduction in reimbursement to the Plaintiffs since the change in reimbursement rates took effect.  (Pugatch, para. 9).  This number also reflects the irresponsibility of the cost studies performed.  At the preliminary injunction stage, the Department claimed that the reimbursement rate change was revenue neutral, and therefore, there was no need to study the impact on quality of care of a reduction in reimbursement.  The Departmetn now admits it has reduced reimbursement, at least as to the Plaintiffs, by 13%, despite the fact that "the number of unduplicated clients that each of the plaintiffs billed for before and after July 1, 2009 is about the same or increased [sic] in numbers."  (Pugatch, Dkt. 39-1, para. 9).  The Department has never considered, much less studied the effect of a 13% reduction in reimbursement, despite the clear elgal mandate that "the final body responsible for setting Medicaid reimbursement rates must study the impact of the contemplated rate reduction on the statutory factors of efficiency, economy, quality of care and access to care *prior* to setting or adjusting payment rates." Cal. Pharmacists Assoc. v. Maxwell-Jolly, 569 F.3d 1098, 1107 (9th Cir. 2009).

9.  Memorandum in Opposition to Defendants' Cross-Motion and in Support of Plaintiffs' Motion for Summary Judgment

III. Defendants' Motion For Summary Judgment is Untimely.

The Court's April 29, 2010 Case Management Order explicitly provided that "All dispositive motions shall be filed by October 29, 2010. This deadline will **not** be extended even if you are having discovery disputes." (Case Management Order, Dkt. 35, p. 1). The Defendants' motion for summary judgment was filed on November 22, 2010. The motion should be either stricken or denied as untimely.

**IV.   Defendants Are Not Entitled to Summary Judgment.**

As discussed in detail above, the Defendants did not perform responsible cost studies, and even if did, the reimbursement rate set in 2009 is not related in any way to those cost studies as required by Federal law. On those bases alone, the Defendants' motion should be denied. The other bases for summary judgment proffered by the Defendants should also be denied.

Armstrong and Clements continue to assert that CMS' approval of the plan amendment which implemented these rate changes is entitled to deference. This issue was addressed at length at pages 2 to 4 of Plaintiffs' Repoly in Support of Motion for Preliminary Injunction, and those arguments are incorporated herein as if fully restated. (Plaintiffs Reply, Dkt. 29, pp. 2-4). In short, that argument demonstrated that the type of ministerial decision made by CMS in a case such as this is entitled to no deference whatsoever, and its persuasive impact should be determined by the rigorousness of CMS' consideration. Since there is no evidence that CMS gave any consideration whatsoever to whether there were responsible cost studies and whether the final rate bore any reasonable relationship to those cost studies, CMS' approval is entitled to neither deference nor persuasive weight.

**VI.   Conclusion**

The State of Idaho in accepting hundreds of millions of dollars in Federal Fianncial Participation in its Medicaid program, accepted the burden of complying with Federal law relating to that program.  The State accepted an obligation to set Medicaid reimbursement rates that bore a reasonable relationship to the actual costs of providing service as determined by responsible cost studies.  In this case, the undisputed facts demonstrate that the cost studies were not responsibly performed and that when the final rate was set, the State simply ignored the studies in any event.  The Court should grant summary judgment as to the pre-emption of the reimbursement rate change under §30A of the Medicaid Act, and schedule appropriate proceedings to determine a remedy.

DATED this 16th day of December, 2010.

HERZFELD & PIOTROWSKI, LLP

_____/s/_____
James M. Piotrowski
Marty Durand
Attorneys for Plaintiffs

11. Memorandum in Opposition to Defendants' Cross-Motion and in Support of Plaintiffs' Motion for Summary Judgment

## CERTIFICATE OF SERVICE

I certify that I have caused a true and correct copy of the foregoing to be served upon the individuals identified below via CM/ECF filing:

Peg Dougherty, Deputy Attorney General
450 W. State Street, 10th Floor
P.O. Box 83720
Boise, Idaho 83702-0036

Dated this 16th day of December, 2010.

_____/s/_____
James M. Piotrowski