UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITY SERVICE COORDINATION, INC., A REFERRAL AND INFORMATION SERVICE LLC; S.O.A.R., INC.; COORDINATED CARE SERVICES, LLC; UNBEFUDDLED, LLC; LLOYD BRINEGAR SHORT & ASSOCIATES, LLC,<br><br>　　　　　　　Plaintiffs,<br>　　v.<br><br>RICHARD ARMSTRONG, and LESLIE CLEMENT, in their official capacities,<br><br>　　　　　　　Defendants. | Case No. 1:09-cv-639-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Before the Court are Plaintiffs' Motion for Summary Judgment (Dkt. 36) and Defendants' Cross Motion for Summary Judgment (Dkt. 40). The Court heard oral argument on January 26, 2011. Being familiar with the record and pleadings, and counsels' arguments at hearing, the Court will grant Plaintiffs' motion, deny Defendant's motion, and set the matter for hearing as to an appropriate remedy.

## BACKGROUND

The factual background of this case was detailed in the Court's Order on Motion for Preliminary Injunction (Dkt. 32), but will be largely repeated here:

Plaintiffs are six Idaho service coordination agencies. In this action, Plaintiffs seek to enjoin Defendants Richard Armstrong, Director of Idaho Department of Health and Welfare (IDHW), and Leslie Clement, Administrator of IDHW's Medicaid Division, from continuing to implement a change in Medicaid reimbursement rates for service coordination benefits provided to developmentally disabled adults and children. This change in reimbursement rates became effective on July 1, 2009. *Compl.*, Dkt. 1. Before July 1, 2009, IDHW reimbursed service coordination agencies that provided ongoing service coordination for developmentally disabled adults and children on a flat, monthly rate per Medicaid participant. *Simnitt Aff.*, Dkt. 14, ¶10. Since July 1, 2009, IDHW requires service coordination agencies to bill such clients in fifteen-minute increments. IDHW reimburses agencies accordingly. *Id.* ¶ 11.

The 2009 rate change "was the result of a multi-year analysis and collaborative process that began in July 2005 when Idaho Code § 56-118 became law." *Pugatch Aff.*, Dkt. 15, ¶ 6. Section 56-118 directs IDHW to "implement a methodology for reviewing and determining reimbursement rates" to service coordination agencies. I.C. § 56-118(1). In May 2005, Sheila Pugatch, the Principal Financial Specialist in IDHW's Office of Reimbursement Policy, was placed in charge of developing the methodology required by section 56-118. *Pugatch Aff.*, ¶ 7.

From 2005 to 2009, IDHW took steps to develop a methodology for reviewing and determining reimbursement rates, including conducting its own annual cost studies. *See id.* ¶¶ 8, 16, 20, 21. IDHW also contracted with the consulting firm Johnston-Villegas-

Grubbs and Associates, LLC (JVGA) to develop surveys, compile date, analyze data, and develop a reimbursement methodology. *Id.* ¶¶ 9,14. IDHW hired another consulting firm to compare Idaho reimbursement rates with those of other states. *Id.* ¶ 12. In April 2008, IDHW prepared draft calculations and sought and used feedback from service coordination agencies to amend the calculations. *Id.* ¶ 20.

Despite its efforts, IDHW ultimately used little if any of the cost studies in revising reimbursement rates, due at least in part to the small sample size of providers who responded to its surveys. Instead, IDHW used data from the Bureau of Labor Statistics (BLS) for Idaho professional and para-professional wages; for general and administrative costs, IDHW used the maximum percentage allowed (10%) without further supporting data, noting that there was insufficient data to justify using a different percentage. *Id.* ¶ 23. IDHW submitted State Plan Amendments for the new reimbursement rates to the Centers for Medicare & Medicaid Services (CMS)[1], which determined that the plans complied with federal regulations. *Id.* ¶ 24; *see Simnitt Aff.*, Dkt. 14-1, Exhs. D-20 and D-21.

In December 2010, shortly after filing this suit, Plaintiffs moved for a preliminary injunction to prevent Defendants from continuing to implement the reimbursement rate. The court considered the parties' pleadings, without oral argument, and issued its

---

[1] CMS is "the federal agency that administers both the federal Medicare and Medicaid programs and enforces the rules and regulations that [IDHW] must comply with to receive federal funding for these programs." *Pugatch Aff.*, ¶ 16.

Memorandum Decision and Order denying the preliminary injunction (Dkt. 32) in March 2010. In its decision, the Court determined that Plaintiffs were unlikely to prevail on the merits. Although Plaintiffs demonstrated they would suffer harm absent preliminary relief, the Court found that the balance of equities tipped in favor of Defendant, and that an injunction was not in the public interest. An order enjoining IDHW from employing the reimbursement rate would require IDHW to violate its approved State Plan, placing Idaho's federal funding for Medicaid benefits recipients at risk. The Court now considers the parties' respective requests for summary judgment.

## STANDARD OF LAW

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d
MEMORANDUM DECISION AND ORDER - 4

1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the issue on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*,

840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

## ANALYSIS

**1.      Timeliness Of IDHW's Cross-Motion For Summary Judgment**

As an initial matter, Plaintiffs argue that Defendant IDHW should not be permitted to bring its cross-motion for summary judgment, as it was filed three weeks after the deadline for dispositive motions set forth in the Court's Case Management Order. *Pls.' Reply*, Dkt. 44 at 10. IDHW responds that its motion is interconnected with Plaintiffs' and consideration of the motions together would be both logical and practical. *IDHW Reply*, Dkt. 46 at 2.

The Ninth Circuit has approved *sua sponte* grants of summary judgment so long as "the losing party has reasonable notice that the sufficiency of his or her claim will be in issue." *U.S. v. 14.02 Acres of Land More or Less in Fresno Cy.*, 547 F.3d 943, 955 (9th Cir. 2008). For notice to be reasonable, a litigant must have sufficient time to develop the facts with which to oppose summary judgment. *Portsmouth Square, Inc. v. S'holders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985). Given that IDHW filed a cross motion that has now been fully briefed, the Court finds that Plaintiffs are on notice that the sufficiency of their claims will be in issue. Although IDHW filed its motion after the deadline, the purpose of the Court's case management orders is largely for the efficient administration of cases. Where, as here, Plaintiffs received adequate notice, and the issues on both parties' motions are intertwined, the Court will consider both motions.

**2.     Requirements Under The Medicaid Act And Ninth Circuit Precedent**

States that choose to participate in Medicaid must comply with Medicaid Act requirements and regulations promulgated by the Secretary of Health and Human Services (HHS). *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). This includes submitting and gaining approval from the HHS Secretary of a comprehensive state plan that details the nature and scope of the state's Medicaid program. *Id.* (citing 42 U.S.C. § 1396a(a) and 42 C.F.R. § 430.10). Section 30(A) of the Medicaid Act requires that a state plan:

> Provide such methods and procedures relating to ... the payment for care and services ... as may be necessary ... to assure that payments are consistent with efficiency, economy,

> and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A). Where a state plan fulfills the Act's requirements, the state will have wide discretion in administering its Medicaid program. *See Lewis v. Hegstrom,* 767 F.2d 1371, 1373 (9th Cir. 1985).

A state plan must "establish, among other things, a scheme for reimbursing health care providers for the medical services provided" to Medicaid recipients. *Wilder*, 496 U.S. at 502. To comply with procedural requirements of § 30(A), a state "must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting." *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly,* 572 F.3d 644, 651-52 (9th Cir.2009) (quoting *Orthopaedic Hosp. v. Belshe,* 103 F.3d 1491, 1496 (9th Cir.1997).) The state must study the impact of a proposed reimbursement rate change before implementing it, or such that studies may meaningfully impact the rates before they are finalized. *Cal. Pharm. Ass'n. v. Maxwell-Jolly*, 596 F.3d 1098, 1115 (9th Cir. 2010).

As to substantive requirements of § 30(A), a state's reimbursement rates must "bear a reasonable relationship to efficient and economical [providers'] costs of providing quality services, unless the [agency] shows some justification for rates that substantially deviate from such costs." *Indep. Living,* 572 F.3d at 651-52 (quoting *Orthopaedic,* 103 F.3d at 1496.) "For payments to be consistent with efficiency, economy and quality of care, they must approximate the cost of quality care provided efficiently and

economically . . .. Judgments can be made as to the efficiency of the providers, the economies they practice and the quality of the services they deliver, but costs are an integral part of the consideration." *Orthopaedic*, 103 F.3d at 1496.

3.  ***Chevron* Deference Applies To CMS's Interpretation Of § 30(A), But Not Requirements Established By The Courts**

The Supreme Court expressed that "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). However, where a statute is silent or unclear regarding the issue before the court, the court must defer to the agency, as long as the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The Ninth Circuit has recognized that agency interpretations of the Medicare and Medicaid statutes are entitled to such deference under *Chevron*. *Resident Councils of Washington v. Leavitt*, 500 F.3d 1025, 1033 (9th Cir. 2007); *Alaska Dep't of Health and Soc. Svcs. v. Ctrs. for Medicare and Medicaid (CMS)*, 424 F.3d 931, 938-39 (9th Cir. 2005). Although neither of the parties discussed these cases, the latter is particularly applicable.

In *Alaska v. CMS*, the Ninth Circuit considered a determination by CMS that disapproved a proposed change in Alaska's state plan, altering the reimbursement rate for expenditures on behalf of tribal health facilities' patients. *Alaska v. CMS*, 424 F.3d at 938-39. The Court in that case noted that Alaska was afforded a formal administrative process, including opportunities to: seek reconsideration, provide written as well as oral

argument, "receive reasoned decisions at multiple levels of review," and file objections to those decisions. *Id.* at 939. The Ninth Circuit characterized these available procedures as "hallmarks of 'fairness and deliberation,'" indicating Congress's intent that CMS's determination should "carry[ ] the force of law." *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). The Court in *Alaska v. CMS* thus concluded, "to the extent that the state challenges the Administrator's interpretation of ambiguities in § 30(A)," *Chevron* applies. *Alaska v. CMS*, 424 F.3d at 939.

Section 30(A) requires payments to be "consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available . . . ." 42 U.S.C. § 1396a(a)(30)(A). To the extent that Plaintiffs here challenge CMS's interpretations of § 30(A), the Court will defer to CMS. However, requirements that the state rely on "responsible cost studies" and that the state's reimbursement rates "bear a reasonable relationship to efficient and economical [providers'] costs of providing quality services" are not within the statute; they are instead, interpretations of § 30(A) by the Ninth Circuit. *See Indep. Living,* 572 F.3d at 651-52; *Orthopaedic,* 103 F.3d at 1496.

The record here does not reveal whether CMS considered the Ninth Circuit's reading of § 30(A). Even if such considerations were part of CMS's decision to approve IDHW's state plan, they need not be afforded deference under *Chevron*. Thus, the Court will engage in its own analysis of IDHW's adherence to the holdings in *Indep. Living* and *Orthopaedic*.

4. **In Setting The New Reimbursement Rate, IDHW Used Reliable Data For Determining Some But Not All Provider Costs**

Plaintiffs rely on the expert report of economist Greg Green, PhD to raise three challenges to IDHW's reimbursement rate change. First, Plaintiffs challenge IDHW's cost studies as inadequate; according to Plaintiffs, the cost studies used a sample size of 16 providers, despite the fact that cost surveys were sent to 244 providers in 2005. *Pls.' Mem.*, Dkt. 36-1 at 12. Second, Plaintiffs assert that IDHW's cost studies bear no relationship to actual provider costs, because they undisputedly failed to account for costs that were lumped into a knowingly undervalued catch-all category. *Pls.' Mem.*, Dkt. 26-1 at 10; Dkt. 36-1 at 14-15.

A. **Adequacy of Sample Size**

Regarding the alleged inadequacy of sample sizes used in IDHW's cost studies, IDHW asserts that Plaintiffs are partially responsible, having refused to participate in the initial survey requests. Under the doctrine of unclean hands, IDHW argues, Plaintiffs should not be able to benefit from their lack of participation, by now claiming that IDHW's data set was too small. The Court disagrees. The doctrine of unclean hands bars relief to a plaintiff who has violated equitable principles in his prior conduct related to a

claim now asserted. *See Seller Agency Council, Inc. v. Kennedy Ctr. For Real Estate Educ.,* Inc., 621 F.3d 981, 986-87 (9th Cir. 2010) (other citations omitted). The Court finds that Plaintiffs' nonparticipation does not amount to a violation of equitable principles, therefore this doctrine is inapplicable.

However, the small sample size in IDHW's cost studies does not, on its own, render IDHW's reimbursement methodology invalid. Data on which a state bases rate settings must be reliable, but may come from the state's own cost studies, or those of others. *Orthopaedic*, 103 F.3d at 1500. States need not directly implement the results of cost studies, and may implement reimbursement rates that vary from cost studies, as long as the state "shows some justification for rates that substantially deviate from" costs identified in the rate studies. *Indep. Living*, 572 F.3d at 651-52 (9th Cir. 2009).

Here, provider participation in cost study surveys was optional as there was no basis on which IDHW could require it. However, it is unclear what efforts were made to encourage participation. Were providers informed of the purpose of the surveys, or of the providers' own stake in the surveys' results? Were any other incentives used?

Plaintiffs acknowledge that IDHW appropriately used data from the Bureau of Labor Statistics (BLS). However, this data was limited to average wage rates and did not include comprehensive statistics for provider costs. The Court agrees that IDHW responsibly used data from the BLS where its own cost studies yielded inadequate results due to a small sample size. However, the absence of reliable data as to costs other than provider wages begs the question whether IDHW calculated reimbursement rates with sufficient accuracy so as to bear a reasonable relationship to providers' actual costs.

B.  **Reasonable Relationship Between Rates And Provider Costs**

Plaintiffs' chief argument that IDHW's rates are not reasonably related to provider costs points to the 10% rate for indirect provider costs. According to Plaintiffs, the undisputed evidence, from IDHW's own studies, reflects that actual indirect costs for providers ranged broadly, and well above the 10% rate used by IDHW in setting the amended reimbursement rates. In response, IDHW asserts that 10% was the maximum amount allowed by CMS without further supporting data; IDHW also points to a study from January 2008 finding that "general and administrative expenditures accounted for only 7.7% of overall provider costs in Idaho." *IDHW Mem.*, Dkt. 39 at 7-8 (citing *Pugatch Aff.*, ¶ 23, Exh. D-8 at 57).

IDHW does not challenge Plaintiffs' assertions that cost studies from other years reflected rates much higher than 7.7%, including up to 79%. *See Pls.' Resp.*, Dkt. 44 at 4-5 (adding administrative staff costs, program supervision costs, supplies, materials, transportation and equipment expenses, and building expenses, provided in IDHW's responses to requests for admission). Thus, missing from IDHW's arguments is an explanation why further supporting data was not obtained, in lieu of using the default limit of 10% for indirect costs.

At oral argument, IDHW suggested that, requiring it to conduct another cost study would yield no different results, as the Court lacks authority to require providers to participate in such a study. This argument reflects poorly on the diligence of IDHW's efforts, or at best, exhibits a lack of creativity in fulfilling IDHW's duties under § 30(A) and applicable caselaw. Avid pursuit of the most accurate cost data is not required. But

a state must set rates that bear a reasonable relationship to actual provider costs. The undisputed evidence supports that a 10% rate does not bear a reasonable relationship to actual indirect costs. IDHW has not provided an adequate justification for its failure to obtain further data to support a more accurate rate for indirect costs, and thus fails to satisfy the Ninth Circuit's rulings in *Indep. Living* and *Orthopaedic*. There is no genuine factual dispute on this issue, thus the Court will grant summary judgment in Plaintiffs' favor, and deny summary judgment to IDHW.

An expedited briefing schedule and hearing will be set to determine the details of an appropriate remedy, in keeping with this decision. The Court envisions that at least three items will need to be addressed at that hearing: (1) the need for and appropriateness of injunctive relief until the cost study can be completed and new rates established; (2) the parameters of the cost study; and (3) the issue of provider cooperation.

With regard to injunctive relief, it would seem that Plaintiffs are entitled to have their reimbursement rates set at the pre-July 1, 2009 levels until the required cost studies can be completed, and new accurate rates established. However, the Court is willing to hear counsel on the appropriateness and necessity of such relief.

With regard, to the parameters of the study, IDHW must conduct a responsible cost study, or otherwise obtain applicable data to set reimbursement rates that reasonably relate to providers' actual costs. However, the only apparent shortcoming in the cost study was the failure to develop an accurate rate for indirect costs. The Court therefore envisions that the appropriate remedy will focus on revising the cost study to resolve that singular deficiency, rather than starting over on a new cost study.

The Court will also expect cooperation from the parties in developing a data base which will adequately inform the study. In fashioning a remedy, the Court may take into account a refusal by the care providers to provide the data necessary to establish an accurate rate for indirect costs. The Court may be compelled to grant IDHW greater leeway in implementing reimbursement rates that vary from their cost studies, if those studies are rendered imperfect because of a lack of data and a lack of cooperation from the providers.

## ORDER

**IT IS ORDERED:**

1. Plaintiffs' Motion for Summary Judgment (Dkt. 36-1) is **GRANTED**.

2. Defendant's Motion for Summary Judgment (Dkt. 40) is **DENIED**.

3. A hearing is set for **Friday, March 25, 2011 at 10:00 a.m.** at the Federal Courthouse in Boise, Idaho, before Judge Winmill, to address the details of an appropriate remedy in keeping with this decision.

4. The parties shall submit briefs addressing (1) the need for and appropriateness of injunctive relief until the cost study can be completed and new rates established, (2) the parameters of the cost study, and (3) the issue of provider cooperation. The parties' briefing shall be due according to the following expedited schedule:

simultaneous opening briefs, limited to 10 pages, by Friday, March 18, 2011; simultaneous response briefs, limited to 5 pages, by Wednesday, March 23, 2011.

DATED: March 10, 2011

_____
B. Lynn Winmill
Chief Judge
United States District Court